**NAVAJO NATION, a federally recognized Indian tribe, Plaintiff,**

v.

**ARIZONA INDEPENDENT REDISTRICTING COMMISSION, a state agency, et al., Defendants.**

**Nos. CV 02–0799–PHX–ROS, CV–02–0807–PHZ–ROS.**

United States District Court, D. Arizona.

Sept. 19, 2002.

Dana Lee Bobroff, Navajo Nation Dept. of Justice, Window Rock, AZ, Marvin S. Cohen, Jusith M. Dworkin, Tina Marie Kirstein–Ezzell, Sacks Tierney PA, Scottsdale, AZ, Patricia Ferguson Bohnee, Sacks Tierney, Scottsdsale, AZ, for Navajo Nation.

Kevin Lohrausb Parsi, Titla & . Parsi, Phoenix, AZ, H. Reed Witherby, Smith &

Duggan, LLP, Boston, MA, Steve M. Titla, Titla & Parsi, Globe, AZ, for San Carlos Apache Tribe of Ariz.

Lisa Tewsbury Hauser, James A. Craft, Gammage & Burnham PLC, Phoenix, AZ, Jose de Jesus Rivera, Haralson Miller Pitt & McAnally, PLC, Phoenix, AZ, for Arizona Independent Redistricting Com'n.

Mary Ruth O'Grady, Joseph Andrew Kanefield, Office of Atty. Gen., Phoenix, AZ, for Betsey Bayless.

Paul F. Eckstein, Michael S. Mandall, Brown & Bain, PA, Phoenix, AZ, Richard A. Halloran, Joshua Grabel, Lewis & Roca, LLP, Phoenix, AZ, Aaron Kizer, Law Office of Aaron Kizer PLC, Phoenix, AZ, for Arizona Minority Coalition for Fair Redistricting, Ramon Valadez, Peter Rios, Carlos Avelar, James Sedillo, Mary Rose Garrido Wilcox, Esther Lumm, Virginia Rivera, Los Abogados.

Jill M. Kennedy, Maricopa County Attorney's Office, Div. of County Counsel, Phoenix, AZ, Otis Smith, Law Office of Otis Smith, Phoenix, AZ, for Count of Maricopa.

Russell H. Burdick, Nancy E. Dean, Apache County Attorney's Office, St. Johns, AZ, for County of Apache.

Derek D. Rapier, Greenlee County Attorney's Office, Clifton, AZ, for County of Greenlee.

Daisy Denise Gilker, Gila County Attorney's Office, Globe, AZ, for County of Gila.

Derek D. Rapier, Greenlee County Attorney's Office, Clifton, AZ, Russell H. Burdick, Nancy E. Dean, Apache County Attorney's Office, St. Johns, AZ, Daisy Denise Gilker, Gila County Attorney's Office, Globe, AZ, for Eastern Arizona Counties Organization.

Kenneth Andrew Angle, Bryce & Udall, Safford, AZ, for County of Graham.

Neil vincent Wake, Linda Delmor Skon, Law Offices of Neil Vincent Wake, Phoenix, AZ, Michael A. Carvin, Jones Day Reavis & Pogue, Washington, DC, for Arizonans for Fair and Legal Redistricting, Jesse Hernandez, Martin Sepulveda, Ilia Terrazas.

John R. Moffitt, City of Prescott Legal Dept., Prescott, AZ, for City of Prescott.

Ivan Legler, Prescott Valley, AZ, for Town of Prescott Valley.

Patrick Irvine, Office of Atty. Gen., Phoenix, AZ, Todd Frederick Lang, Office of Atty. Gen., Solicitor General & Opinions Section, Phoenix, AZ, for Citizens Clean Elections Com'n.

Daniel R. Ortega, Jr., Ortega & Assoc., PC, Phoenix, AZ, for Hopi Tribe.

Martha Starr Chase, Santa Cruz County Atty., Nogales, AZ, Ronald Marc Lehman, Gabroy Rollman & Bosse PC, Tucson, AZ, for County of Santa Cruz.

David J. Cantelme, Jennings Strouss & Salmon PLC, Phoenix, AZ, for City of Flagstaff.

Bruce E. Cain, Berkeley, CA, pro se.

Before: ROSLYN O. SILVER and SUSAN R. BOLTON, District Judges, and MARSHA S. BERZON, U.S. Circuit Judge.

## OPINION

SILVER, District Judge.

A three-judge panel ("Court") was convened on May 8, 2002 to determine whether Arizona's 1994 legislative districts were unconstitutional and if necessary to adopt an interim legislative redistricting plan that meets the requirements of the United States Constitution and the Voting Rights Act of 1965, 42 U.S.C. §§ 1973, 1973c. On May 24 the parties stipulated to an interim plan ("IRC Proposed Plan" or "Plan"), and on May 29 presented evidence in support of the adoption of this interim Plan for the

2002 elections. The Court issued an order the same day approving and adopting the Plan for interim use in the 2002 legislative elections and promised an opinion to follow. This is that opinion.

# I BACKGROUND

a. Arizona's Legislative Redistricting History

Arizona has a bicameral state legislature comprised of 60 representatives and 30 senators drawn from 30 legislative districts. ARIZ. CONST. art. IV, Pt. 2, § 1(1), (2). Historically, the legislature undertook the assignment of redistricting under special session called by the governor. *See* ARIZ. CONST. art. IV, Pt. § 1 (historical notes to 2000 amendment); *Klahr v. Williams*, 339 F.Supp. 922, 923 (D.Ariz. 1972)(per curiam).

Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, provides that any state or jurisdiction with a history of discrimination against minority voters is required to submit redistricting plans for preclearance to the United States Department of Justice ("DOJ") or the District Court for the District of Columbia. Because of this history, *see Ely v. Klahr*, 403 U.S. 108, 118–19, 91 S.Ct. 1803, 29 L.Ed.2d 352 (1971), Arizona has been required to obtain preclearance[1] pursuant to Section 5 since November 1, 1972, *see Arizona v. Reno*, 887 F.Supp. 318, 319 (D.D.C.1995). *see also* http://www .usdoj.gov/crt/voting/sec_5/covered.htm (Department of Justice's list of covered jurisdictions).

In the past, the Arizona legislature undertook to devise constitutionally valid redistricting plans and, beginning with the 1980 census, submitted its redistricting plans to DOJ for preclearance. *See, e.g., Klahr v. Goddard*, 250 F.Supp. 537

(D.Ariz.) (Congressional and legislative redistricting post–1960 census), *amended by* 254 F.Supp. 997 (D.Ariz.), *amended by*, 289 F.Supp. 827 (D.Ariz.1966); *Klahr*, 339 F.Supp. at 923–24 (Congressional and legislative redistricting post–1970 census); *Goddard v. Babbitt*, 536 F.Supp. 538 (D.Ariz.1982) (Congressional and legislative redistricting post–1980 census); *Arizonans for Fair Representation v. Symington*, 828 F.Supp. 684 (D.Ariz.1992) (Congressional redistricting post–1990 census); *Arizonans for Fair Representation v. Symington*, 1993 WL 375329 (D.Ariz. June 19, 1992) (legislative redistricting post–1990 census).

In November 2000, Arizona voters passed Proposition 106 in part to improve voter and candidate participation in the redistricting process. *See* ARIZ. CONST. art. IV, Pt. 2, § 1 (historical notes to 2000 amendment). Proposition 106 amended Arizona's constitution and reassigned the role of redistricting from the State legislature to the Independent Redistricting Commission ("IRC"), composed of two Republicans, two Democrats and an independent who serves as the chair. *See* ARIZ. CONST. art. IV, Pt. 2, § 1(6), (8).

One of Proposition 106's unique features requires the IRC to begin the mapping process with a "clean slate" by creating equally populous districts in a grid-like pattern across the State. ARIZ. CONST. art. IV, Pt. 2, § 1(14). The IRC must ensure that the configuration of the districts complies with the United States Constitution and the Voting Rights Act. ARIZ. CONST. art. IV, Pt. 2, § 1(14)(A). From there the IRC must adjust the grids according to traditional mapping considerations such as

---

**1.** A covered jurisdiction may "bail out" of Section 5's preclearance requirement by seeking a declaratory judgment in the district court for the District of Columbia. *Cf. City of Rome v. United States,* 472 F.Supp. 221, 229 (D.D.C.1979) (holding that a city that is a political subdivision of a covered state may not independently bail out of Section 5's preclearance requirement).

compactness, contiguity and communities of interest. ARIZ. CONST. art. IV, Pt. 2, § 1(14)(C), (D). To the extent practicable the IRC is required to use visible geographic features, city, town and county boundaries, and undivided census tracts. ARIZ. CONST. art. IV, Pt. 2, § 1(14)(E). The IRC must attempt to create competitive districts to the extent practicable where doing so would create no significant detriment to the other factors. ARIZ. CONST. art. IV, Pt. 2, § 1(14)(F). Uniquely, however, the IRC is completely prohibited from considering incumbency. ARIZ. CONST. art. IV, Pt. 2, § 1(15).

The 2000 decennial census indicated that Arizona's population had increased from 3,665,226 in 1990 to 5,130,632 in 2000, and showed substantial population shifts within the pre-existing 1994 Congressional and legislative districts. As a result, redistricting to conform to federal and State law became necessary. Consequently, in June 2001 the IRC commenced the legal process of reshaping the boundaries of Arizona's Congressional and legislative districts. To achieve the Arizona constitutional goals the IRC prompted the public, private and public groups and entities, including cities and counties, to take an interest and become involved in the redistricting process.

The IRC held a series of public hearings throughout the State in the summer of 2001, and finally adopted a redistricting plan in October 2001 ("IRC 2001 Plan"). After a thirty-day public comment period provided for by law, see ARIZ. CONST. art. IV, Pt. 2, § 1(16), in November 2001 the IRC certified the new Congressional and legislative district boundaries to Arizona's Secretary of State, see ARIZ. CONST. art. IV, Pt. 2, § 1(17). On January 24, 2002 the IRC, on behalf of the State of Arizona, submitted the new Congressional and legislative district plans to the DOJ for preclearance. A decision from the DOJ, however, was not immediately forthcoming. The DOJ has 60 days to review and respond to a preclearance request, and may extend the final decision for an additional 60 days. See 28 C.F.R. 51.37; http://www.usdoj.gov/crt/voting/sec_5/making.htm (explanation of the preclearance process and response times).

b. State Litigation

On March 6, 2002, the Arizona Minority Coalition for Fair Redistricting, Los Abogados, Inc., and several individual plaintiffs (collectively, the "Minority Coalition" or "Coalition" [2]) filed a complaint in State court against the IRC alleging in relevant part that the IRC failed to fulfill all of the redistricting goals required in the Arizona Constitution. (Docket # 9 in CV02–807–PHX–ROS, Exhibit 2) In particular, the Minority Coalition requested remedial action to cure the IRC's failure to comply with its duty to create and maintain "competitive" districts, and to remedy the reduction of the number of competitive districts in the IRC's 2001 Plan. See ARIZ. CONST. art. IV, part 2, § 1(14)(F).[3] A number of groups intervened to protect their interests, including the Navajo Nation and the San Carlos Apache Tribe, various counties, and Arizonans for Fair and Legal Redistricting, Inc., created to represent the concerns of the Republican Party. (Docket # 5 in CV02–807–PHX–ROS)

---

**2.** The Minority Coalition is a statewide group of elected Hispanic officials, community leaders and citizens who organized in February 2001 because an Hispanic had not been appointed to the IRC. (Docket # 9, Exhibit 1 at 2; R.T. 5/29/02 at 80)

**3.** "Competitive" districts allow for more competitive elections between established political parties. (see Docket # 9 in CV02–807–PHX–ROS, Ex. 1)

On March 26, 2002 the DOJ responded in part to the IRC's request for preclearance. (Docket # 15, Ex. G) The DOJ did not object to the IRC's 2001 Congressional district Plan. *Id.* The Department of Justice, however, left in suspension the State's legislative districts, concluding that it was not prepared to find that the IRC 2001 Plan did not have the purpose and would not have the effect of denying or abridging the right to vote on account of race, color, or membership in a "language minority group." *Id.* In order to comprehensively review the 2001 Plan, the Department of Justice requested additional information from the IRC. *Id.*

As the May 2, 2002 State trial date approached State Judge Kenneth L. Fields was informed that the IRC had used inaccurate data to evaluate competitiveness. Consequently the trial date was continued until a date subsequent to the 2002 election.

The June 12, 2002, statutory deadline for State legislative candidates to collect signatures, qualify for public contributions, and file petitions for the 2002 elections was quickly approaching. Candidates had communicated to the Secretary of State and the county departments responsible for establishing and enforcing rules for candidacy their uncertainty whether to proceed as if running for office in the 1994–2000 districts ("1994 legislative districts"), which appeared to run afoul of the Fourteenth Amendment's requirement for equally populated districts, or in the districts created in the IRC 2001 Plan, which had not yet been implemented by the Secretary of State. The counties and state officials readying for elections and voters straddling ambiguous district boundaries appealed to the State legislature for clarity regarding legislative district lines. The legislature responded by enacting an emergency measure, Senate Bill 1032, permitting legislative candidates to collect signatures from voters within the 1994 legislative districts, the IRC 2001 Plan districts or any DOJ precleared districts.[4] Unfortunately, a solution did not come to pass with this enactment because again DOJ preclearance was required before the law became effective. The concerned parties then turned to this Court for relief.

### c. Federal Litigation

Two separate actions were filed in this Court on May 1, 2002. In the first, the Navajo Nation and the San Carlos Apache Tribe (the "Native American Plaintiffs") named as defendants the IRC and Betsey Bayless, in her official capacity as Arizona Secretary of State. They alleged, *inter alia*, that the IRC 2001 Plan would diminish the voting strength of Native Americans, in violation of Section 2 of the Voting Rights Act, as amended, 42 U.S.C. § 1973. They sought an order adopting the Navajo Illustrative Plan in place of the 1994 Legislative Districts or the IRC 2001 Plan.[5] In the companion case, the IRC brought suit requesting an injunction against the Arizona Secretary of State to prohibit her from using the 1994 legislative districts for the 2002 legislative elections and requiring that she implement a constitutional legislative plan for those elections.

The Court ordered a status hearing that was held on May 10, at which time motions were granted consolidating the two cases. The Court also granted motions allowing

---

**4.** On May 1, 2002, the Governor signed SB 1032 into law. (2002 Ariz. Legis. Serv. 119 (West))

**5.** The Native American Plaintiffs later moved to amend their complaint and requested the Court to adopt the Navajo Preferred Plan (Docket # 16). The Court denied the motion after the Native American Plaintiffs' complaint was dismissed without prejudice. (R.T. 5/20/02 at 111)

numerous groups and governmental entities to intervene, that is, the Arizona Minority Coalition, Ramon Valadez, Peter Rios, Carlos Avelar, James Sedillo, Mary Rose Garrido Wilcox, Esther Lumm, Virginia Rivera, Los Abogados, Inc., the Citizens Clean Elections Commission, Arizonans for Fair and Legal Redistricting, Inc., the Hopi Tribe, Maricopa County, Apache County, Greenlee County, Gila County, Eastern Arizona Counties Organization, City of Prescott, Town of Prescott Valley, Graham County, and City of Flagstaff. A number of these intervenor parties filed complaints and cross-claims.

The Minority Coalition argued that *Lopez v. Monterey County*, 519 U.S. 9, 117 S.Ct. 340, 136 L.Ed.2d 273 (1996), and its progeny prevented the Court from adopting the IRC 2001 Plan because the DOJ had not precleared it. The IRC and Arizonans for Fair and Legal Redistricting contended that the Supreme Court of the United States beginning with *Upham v. Seamon*, 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982) (per curiam), requires courts to defer to legislative plans, and that the IRC 2001 Plan was such a plan. The Court ordered expedited briefing on the nature, scope and jurisdiction of the litigation, and set the hearing to begin on May 20, 2002 to resolve the controversy raised in both actions.[6]

On May 15, the Court sent a letter to the United States Attorney for Arizona with copies to all parties inviting a knowledgeable person from the DOJ to attend the May 20 hearing and provide the Court and counsel with a comprehensive report on the status of preclearance of the IRC 2001 Plan for Arizona's legislative districts.

On May 17, the Court issued an order reconciling the conflicting interpretations of the *Upham* and *Lopez* cases, and establishing an agenda for the May 20 hearing.[7] On the same day, the Court appointed, pursuant to Fed.R.Civ.P. 53, Professor Bruce Cain of the University of California, Berkeley, as Special Master to evaluate evidence submitted by the parties in support of their proposed redistricting plans, and to assist the Court, if necessary, in developing a legal plan. The Court also notified the parties that in response to the Court's invitation, Robert Berman, Deputy Chief Voting Rights for the DOJ, would attend the May 20 hearing and inform the Court and parties of the status of preclearance for the IRC 2001 Plan.

On May 20, Robert Berman presented the DOJ's letter denying preclearance to the IRC Plan and objecting in particular to five Arizona legislative districts. (Ex. 499) The DOJ proposed that to remedy problems with the five districts the IRC could restore three of the five districts to their benchmark[8] figures, or create three new majority-minority districts elsewhere in the State, or some combination of the two proposals. Mr. Berman indicated that the DOJ had no objection to the remaining districts.

In light of the DOJ's identification of five problem districts primarily in the Phoenix and Tucson areas, the Native American Plaintiffs and intervenor, the Hopi Tribe, moved to dismiss without prej-

---

6. The Court inquired of the parties concerning the status of preclearance, but counsel was indefinite on whether the DOJ did consider the presentation of the IRC's 2001 Plan submitted for decision. Further, it was equally unclear, if the DOJ did consider the Plan submitted for decision, when the decision from DOJ would issue.

7. Judge Berzon did not concur in the legal analysis contained in that order.

8. The last legally enforceable plan used by the jurisdiction serves as the "benchmark," or baseline for comparison in a Section 5 retrogression analysis. *Colleton County Council v. McConnell*, 201 F.Supp.2d 618, 644 (D.S.C. 2002).

udice, and the Court granted their motions.

The IRC then requested that the Court recess the hearing and permit it to reconvene to consider and attempt to resolve the DOJ's objections. The Court decided without opposition from the parties remaining to grant the IRC's request and reset the hearing for May 29 to evaluate evidence and adopt an interim plan.

The IRC followed by convening public hearings on May 20, May 21, May 22 and May 23 (Ex. 492–495). The Special Master attended the first three of these hearings (Ex. 492 at 6; Ex. 493 at 56; Ex. 494 at 108).

On May 22, the parties filed a joint motion for an extension of time in which to file their witness lists, exhibits and responses. An emergency hearing was held on the morning of May 23 to address the motion. Counsel agreed that the scope of the evidentiary hearing should be limited to finding a remedy for the five IRC 2001 Plan's Districts (13, 14, 15, 23, and 29) to which DOJ had objected, and to considering proposals for reshaping three of those Districts to remedy the problems raised by the DOJ.

The Court upon request from the Secretary of State and Citizens for Clean Elections, and without objection, issued an Order on May 23 to address the emergency regarding candidate petitions, signatures and requests for funds. The Court also directed the IRC to meet with the counties to find a resolution for their election urgencies and to provide the Court with a proposed order by May 24.

On May 24, the parties informed the Court that the IRC had adopted an interim plan, the IRC Proposed Plan or Plan, and that all the remaining parties had agreed to it. At an emergency hearing held the same day, the Court was advised that the parties were prepared to support their joint position with evidence that the interim Plan should be adopted by the Court for the 2002 legislative elections. The Minority Coalition and Arizonans for Fair and Legal Representation also agreed that there was no Section 2, Voting Rights Act issue with the proposed plan. (R.T. 5/24/02 at 29, 38). The Court ordered the parties to file a stipulated statement of law and evidence by May 28, and commented that because of the stipulation, the Special Master's efforts to assist the Court had been greatly reduced but that his involvement would expedite the Court's evaluation of the Plan in light of the Voting Rights Act and the United States Constitution. The Court ordered counsel to provide all necessary information to the Special Master; the parties agreed and diligently worked to comply with the Court's order.

On May 28, the Court issued an Order declaring the Arizona 1994 legislative districts unconstitutional. On the same day the Special Master issued his report recommending that the Court accept the IRC Proposed Plan as the best choice for an interim plan for the 2002 elections, concluding that it adequately addressed the DOJ's objections by restoring District 23 to its benchmark level and creating two 55% Hispanic VAP districts in the Phoenix area. Finally, the IRC certified the Plan to Secretary of State Bayless for use in the 2002 elections and filed the parties' joint stipulation of facts and law. (Docket # 108 at 3)

At the hearing on May 29, the parties presented evidence, at the conclusion of which the Court ordered: (1) use of the Plan for the 2002 elections; (2) that legislators elected in 2002 pursuant to same Plan were to serve for the full two-year term beginning in January 2003; and (3) emergency relief for counties to enable them to prepare for and hold the 2002 legislative district elections.

## II DISCUSSION

### a. Jurisdiction

Article III, § 2 of the United States Constitution provides federal jurisdiction of cases arising under the Constitution and laws of the United States. U.S. CONST. art III, § 2. The claims in this action arose under the Constitution of the United States, the Constitution of Arizona, and Acts of Congress. Specifically, the Plaintiffs and intervenors alleged injuries pursuant to Art. I, § 2 of the Constitution of the United States, the Fourteenth Amendment, Sec. 1 and 2, the Fifteenth Amendment, 42 U.S.C. §§ 1973, 1983, 1988, and ARIZ. CONST. art. IV, pt. 2, § 1(14). Federal district courts have original jurisdiction over the constitutional and federal claims pursuant to 28 U.S.C. § 1331, 1343(a)(3) and (a)(4), and supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367. This three-judge Court was convened pursuant to 28 U.S.C. § 2284(a), because the litigation challenged the constitutionality of the apportionment of a statewide legislative body.[9]

### b. Standing

■ In order to establish standing, a plaintiff must prove entitlement to an adjudication of the particular claims asserted. *Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). A plaintiff must allege three constitutional requirements: (1) an injury or imminent threat of an injury that is "concrete and particularized," (2) a causal relationship between the injury and the defendant's actions, and (3) that the court is able to provide relief from the injury. *Northeastern Fla. Contractors v. Jacksonville,* 508 U.S. 656, 663–64, 113 S.Ct. 2297, 124

L.Ed.2d 586 (1993). An organization can establish standing if its members have standing to sue in their own right, the interests it seeks to protect are germane to the organization's purposes, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Ecological Rights Found. v. Pac. Lumber Co.,* 230 F.3d 1141, 1147 (9th Cir.2000).

■ In cases invoking the powers of a three judge court pursuant to 28 U.S.C. 2284, a plaintiff can demonstrate standing by showing a cognizable, personal injury. *Sinkfield v. Kelley,* 531 U.S. 28, 29–30, 121 S.Ct. 446, 148 L.Ed.2d 329 (2000) (per curiam) (holding that parties who lived in districts neighboring a gerrymandered district lacked standing because they could not show that they personally had been subjected to a racial classification).

The Minority Coalition represented that among its members are residents of each of the legislative districts affected by the IRC's Proposed Plan. The Court found the Coalition had standing to proceed on the condition that a Coalition member file an affidavit declaring that the group had members in each such district. The affidavit was filed on May 21, 2002. (Docket # 85)

The Court found that Arizonans for Fair and Legal Representation had established standing.

### c. The Court's Authority to Order Emergency Interim Relief

This Court determined in the Order of May 23 that it had authority to grant emergency interim relief pursuant to 28

9. In the May 17, 2002 Order, this Court tentatively concluded that it had jurisdiction to hear Voting Rights Act claims that arise in the course of determining the propriety of a new redistricting plan to remedy a constitutionally invalid one, and we now reaffirm that conclusion. *See* The Three–Judge District Court in Voting Rights Litigation, 30 U. MICH. J.L. REF. 79, 95 (1996) (noting that three-judge courts virtually without discussion exercise a form of supplemental jurisdiction to adjudicate Voting Rights Act claims).

U.S.C. § 2284. *See Terrazas v. Slagle,* 789 F.Supp. 828, 834, 843–44 (W.D.Tex.1991). In that Order the Court authorized the Secretary of State to accept a candidate's petition containing qualifying signatures from a district of the candidate's residence based on the Arizona 1994 legislative districts, any IRC map certified to the Secretary of State or any maps precleared by the DOJ. Further, the Secretary of State was authorized to accept as valid any Clean Elections Qualifying Contribution slip from a qualified elector of a legislative district in which a candidate resided, based on any of the same maps. (Docket # 90)

d. The Court's Authority to Order Use of the IRC Proposed Plan for the 2002 Legislative Elections

The law governing the authority of courts in redistricting cases to adopt, approve and/or configure districts is found in a labyrinth of opinions that exist by virtue of different governmental structures, diverse local laws, and unique political processes that come into play in these types of cases. This litigation too reflected a confluence of unusual features: (1) an independent redistricting commission adopted a plan that could not go into effect during a delay in securing DOJ preclearance; (2) when the DOJ spoke, it cleared some but not all districts; (3) all the parties, including the IRC, finally agreed upon an alternative plan and jointly asserted that the plan addressed the DOJ's concern, the Constitution, and applicable federal laws; (4) the new Plan did not fully comply with the IRC's State constitution notice requirements; (5) the litigation was impacted by an urgency to adopt a plan which would enable the Arizona 2002 legislative elections to occur on time. *See, e.g., De Grandy v. Wetherell,* 794 F.Supp. 1076 (N.D.Fla.1992) (three judge court adopted the court's emergency plan after state legislature failed to pass a Congressional redistricting plan which would have required DOJ preclearance); *Upham,* 456 U.S. at

38, 102 S.Ct. 1518 (DOJ did not preclear a plan because of objections to only two of Texas' Congressional districts); *Kimble v. County of Niagara,* 826 F.Supp. 664 (W.D.N.Y.1993) (parties stipulated to plan adopted by county legislature under special session).

■ On May 20, after the DOJ objected to a portion of the IRC 2001 Plan, the Court had several alternatives open to it. *See Campos v. City of Houston,* 968 F.2d 446, 452 (5th Cir.1992) (per curiam). The Court is not bound by the DOJ's interpretation of the Voting Rights Act, *Abrams v. Johnson,* 515 U.S. 900, 923, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995), and the Court finds that it had the responsibility to ensure that the redistricting plan complied with the United States Constitution and the Voting Rights Act, taking account of the concerns raised by the DOJ in its response letter. *See Balderas v. Texas,* No. 6:01CV158, at 4 (E.D.Tex.2001), *available at* http://gis1.tlc.state.tx.us/static/pdf/housepc.pdf. The Court also could have configured its own plan for the objected-to districts, applying the appropriate Constitutional and Section 5 Voting Rights Act standards. *See Colleton County Council v. McConnell,* 201 F.Supp.2d 618, 636 (D.S.C.2002) (order); *see also Abrams v. Johnson,* 521 U.S. 74, 117 S.Ct. 1925, 138 L.Ed.2d 285, (1997) (district court developed own plan after legislature failed to adopt a redistricting plan).

The Court's focus shifted, however, when the remaining parties stipulated on May 24 to the IRC Proposed Plan, and jointly asserted that the Plan solved the DOJ's concerns and complied with the Voting Rights Act and United States Constitution. Ultimately, the Court found it unnecessary to independently shape the unprecleared districts. Rather, the Court reviewed the Plan to insure compliance with federal law and then adopted it.

1. Deference to state legislative plans.

First, there exists uninterrupted Supreme Court precedent holding that state legislatures have primary jurisdiction over legislative reapportionment, *see White v. Weiser*, 412 U.S. 783, 795, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973), *Upham v. Seamon*, 456 U.S. 37, 40–41, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982), and may assign Congressional and state legislative redistricting to a commission, *see Grivetti v. Ill. State Electoral Bd.*, 335 F.Supp. 779, 790 (N.D.Ill.1971). Here, Proposition 106 redirected redistricting responsibilities from the State legislature to the IRC and established the procedures to be followed by the Commission. *See* ARIZ. CONST. art. IV, Pt. 2, § 1(3)-(23). *See* requirements of the IRC including a 48–hour public notice requirement for its public meetings. *Id.* § 1(12) ("Where a quorum is present, the [IRC] shall conduct business in meetings open to the public, with 48 or more hours public notice provided"); *Id.* § 1(16) ("advertise a draft map of Congressional districts and a draft map of legislative districts to the public for comment, which comment shall be taken for at least thirty days.").

Further, the requirement of deference to a legislative plan exists even in cases where the plan does not strictly comply with state law, particularly where there are exigent circumstances. *See Straw v. Barbour County*, 864 F.Supp. 1148, 1155 & n. 15 (M.D.Ala.1994) (deference to plan even though state law requiring notice for meeting was not complied with, where exigent circumstances existed); *see also Tallahassee Branch of NAACP v. Leon County*, 827 F.2d 1436, 1438–39 (11th Cir.1987) (county plan was entitled to deference though county enacted a remedial plan without a referendum as required by state law).[10]

The IRC conceded that it was unable to comply with the public notice requirements set forth in the Arizona constitution before adopting on an emergency basis the IRC Proposed Plan. The IRC, however, assured the Court that it had complied with the requirements for public notice before adopting and certifying the IRC 2001 Plan, and that all reasonable efforts were made to notify the public of the hearings held between May 20 and May 24 before making changes to the 2001 Plan. Further, it is undisputed that many interested parties with disparate views, including the Minority Coalition, and the Arizonans for Fair and Legal Redistricting, actively participated in the process of developing the interim Plan.

The Court finds that the IRC Proposed Plan is a legislative plan entitled to deference.

2. Compliance with United States Constitution and Voting Rights Act

The parties submitted statistical evidence in support of the IRC Proposed Plan. We summarize in the table that follows the pertinent information regarding

---

**10.** Additionally, deference is appropriate where an urgency is combined with a plan that is proposed to temporarily settle the dispute between clearly disparate political groups and interests, if the proposal meets constitutional and federal statutory muster. *Cf. Kimble v. County of Niagara*, 826 F.Supp. 664, 668–69 (W.D.N.Y.1993) (single-judge district court adopted for permanent use a plan stipulated to by county legislature and parties after the legislature failed to enact a plan for elections); *Rybicki v. State Bd. of Elections*, 574 F.Supp. 1082, 1123–24 (N.D.Ill.1982) (three-judge district court approved portion of permanent plan agreed to by redistricting commission and Hispanic parties), *amended by* 574 F.Supp. 1147 (N.D.Ill.) (amending opinion with respect to African–American parties in light of Voting Rights Act amendment), *amended by* 574 F.Supp. 1161 (N.D.Ill. 1983) (adopting settlement plan).

the three districts restored to their benchmark levels (in bold) and the six neighboring districts that were affected by the changes. (Ex. 486).

| District | Total Population | Hispanic Percentage | Hispanic VAP[11] Percentage | Minority Percentage | Minority VAP Percentage |
|---|---|---|---|---|---|
| 12 | 177,189 | 31.68 | 27.27 | 42.27 | 37.19 |
| 13 | 167,094 | 60.54 | 55.25 | 71.28 | 65.51 |
| 14 | 166,435 | 61.48 | 55.16 | 71.57 | 65.09 |
| 15 | 169,369 | 44.62 | 38.09 | 57.75 | 50.37 |
| 16 | 165,418 | 64.74 | 59.73 | 81.82 | 77.22 |
| 19 | 179,484 | 9.48 | 7.54 | 13.86 | 11.28 |
| 22 | 179,209 | 11.49 | 9.72 | 18.15 | 15.74 |
| 23 | 172,317 | 34.59 | 30.63 | 50.05 | 44.07 |
| 26 | 164,041 | 12.57 | 10.42 | 17.78 | 15.11 |

#### i. Fourteenth Amendment

 Congressional districts must comply with the "one person one vote" requirement under Article I, § 2 of the United States Constitution as nearly as practicable. *Abrams v. Johnson,* 521 U.S. 74, 98, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997). A court-ordered plan is held to an even stricter *de minimis* standard of population equality than one drawn by a state legislature. *Id.*

 The requirement for equally populated legislative districts derives from the Fourteenth Amendment of the United States Constitution, which allows more flexibility in population deviations than those associated with Congressional districts. *Reynolds v. Sims,* 377 U.S. 533, 577–78, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Consequently, minor deviations of less than 10% from absolute equality among legislative districts are presumptively valid. *Brown v. Thomson,* 462 U.S. 835, 842, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983); *Deem v. Manchin,* 188 F.Supp.2d 651, 656 (N.D.W.Va.2002); *Johnson v. Miller,* 922 F.Supp. 1556, 1561 (S.D.Ga.1995).

At the May 20 hearing, the Court considered the affidavit of Douglas Johnson regarding the year 2000 population deviations in the 1994 districts. Significantly, the ideal population of a legislative district based on the 2000 census figures for Arizona is 171,021 persons and the 1994 legislative districts deviated from the ideal population by as much as 43%. On May 28, 2002 the Court declared the 1994 legislative districts unconstitutional.

We found no such unconstitutional deviation in the IRC Proposed Plan regarding the legislative districts reconfigured between May 20 and 24, 2002. The districts in the IRC Proposed Plan have population deviations that range from –4.08% (District 26) to +4.95% (District 19), for a total deviation of 9.03%. *See Jeffers v. Clinton,* 756 F.Supp. 1195, 1201 (E.D.Ark.1990) (10.9% total deviation, with one district 5.8% above the ideal population and one district 5.1% below it was acceptable deviation).

The IRC Proposed Plan substantially complied with the Fourteenth Amendment's requirement for equal populations among districts. *See Kimble,* 826 F.Supp. at 670.

#### ii. Voting Rights Act

 Whether a redistricting plan complies with the Voting Rights Act re-

---

**11.** "VAP" means voting age population.

quires statistical evidence. The exact percentage of minority voters required for compliance depends on the facts of each case. *See Good v. Austin,* 800 F.Supp. 557, 561 (E.D.Mich.1992); *Jeffers,* 756 F.Supp. at 1200. The hearings held on May 20 and May 29 provided the Court with relevant evidence from which to determine whether the Plan complied with the Voting Rights Act.

### (1) May 20 Hearing

First, Robert Berman proffered the DOJ's preclearance letter in which Ralph F. Boyd, Jr., Assistant Attorney General for the DOJ's Civil Rights Division, objected to the IRC 2001 Plan. Berman explained that because the IRC 2001 Plan is a single, indivisible unit, the DOJ could not provide a piecemeal preclearance. Berman clarified, however, that the DOJ objected to the IRC 2001 Plan only as to the areas identified in the letter.

In the letter Boyd noted that the State's Hispanic share of the population increased from 18.8 percent in 1990 to 25.3 percent in 2000. Of the 1994 legislative districts, seven districts had populations where Hispanic persons formed a majority (Districts 5, 7, 8, 10, 11, 22 and 23), and in one district (District 3) Native Americans formed a majority. These eight districts constituted the benchmark plan. In five of those districts (3, 10, 11, 22 and 23), a majority of the voting age population were minority individuals. He continued that the IRC 2001 Plan contained ten districts (Districts 2, 13, 14, 15, 16, 23, 24, 25, 27 and 29) in which the IRC indicated that minority voters would be able to elect candidates of their choice, but he found that the IRC had not met its burden with respect to five of those districts (Districts 13, 14, 15, 23 and 29). Accordingly, DOJ concluded that the IRC 2001 Plan had a net loss of three districts in which minority voters would be able to elect candidates of their choice. Boyd proposed that the IRC could remedy the impermissible retrogression by restoring three districts from among the identified problem districts, by creating three viable new majority-minority districts elsewhere in the State, or by some combination of these methods. Boyd also noted that proposed District 23 may have been reshaped at least in part with a retrogressive intent because of the removal of the towns of San Manuel (46.2% Hispanic) and Oracle (38.3% Hispanic) and the inclusion of the City of Casa Grande (39.1% Anglo) and virtually all of Apache Junction (87.9% Anglo).[12]

### (2) May 29 Hearing

At the May 29 hearing, evidence was presented and admitted in support of the IRC's Proposed Plan, including the 1994 legislative districts maps, overlays of the 2001 IRC Plan, and the IRC Proposed Plan, and transcripts of the IRC meetings held between May 20 and 24, 2002.

---

**12.** Berman stated that the DOJ had received Senate Bill 1032 a few days earlier and was reviewing it on an expedited basis, and that the DOJ had precleared precincts in Maricopa County. The record is silent regarding the outcome of DOJ preclearance of SB 1032. The Court asked Berman how the DOJ could preclear precincts located within legislative districts that had not been precleared. Berman explained that the DOJ often does not object to precinct or polling place changes, partly because it is the counties rather than the state that submit precinct changes for preclearance. The counties, Berman noted, are not directly tied to the IRC's redistricting decisions, and the DOJ's determination might have been different if a county had submitted a redistricting and a precinct change. Further, counties consider different factors in making precinct changes than is considered by a state in making legislative district changes. For instance, a county may be bound by a state law that limits the number of registered voters in a precinct, or a county may need to draw a precinct line to include a polling place.

Douglas Johnson, a consultant with the National Demographics Corporation and the IRC consultant, testified via video teleconference from Honolulu Hawaii. Johnson guided the Court through the series of maps and overlays explaining the steps taken and factors considered to configure districts for the 2001 Plan, to reconfigure the districts necessary to address the DOJ's objections, and meet constitutional and statutory requirements.[13]

Johnson identified the five districts to which the DOJ objected: District 29 in Tucson; District 23 in Pinal County; and Districts 13, 14 and 15 in Maricopa County. He stated that throughout the redistricting process, the IRC focused on "AURs", or Arizona Units of Representation, an approach to map drawing developed by the National Demographics Corporation. Johnson defined an AUR as a citizen-defined community linked by economic, social and cultural factors, used by the IRC as building blocks that were kept intact as much as possible. He explained that another guideline adopted by the IRC was to avoid drawing lines that would split precincts.

The DOJ objected to IRC 2001 District 29 because its Hispanic VAP was 45%, compared to its benchmark Hispanic VAP of 55%. Johnson explained the IRC's efforts to increase the Hispanic VAP in this District.[14] The IRC first adjusted District 29's boundaries to increase the Hispanic VAP to 55%, but the proposed change reduced the Hispanic VAP in District 27 to 35%. Both the IRC and the Minority Coalition were concerned with this effect on District 27, and ultimately the IRC maintained the 2001 Plan's boundaries and a 45% Hispanic VAP for District 29.

Johnson further testified that the IRC made three changes to IRC 2001 District 23 in response to the DOJ's objections. The DOJ's paramount concern was that in the benchmark district Hispanics had the opportunity to elect the candidate of their choice with an Hispanic VAP of only 30.18%, whereas the Hispanic VAP in District 23 in the 2001 IRC Plan was 25.72%. In light of the DOJ's concern that the towns of San Manuel and Oracle may have been excluded from District 23 with a retrogressive intent, the IRC's Proposed Plan extended District 23's boundaries to include these towns. This move decreased the total population in District 26, but the change of less than 5% deviation from the ideal population was acceptable to the IRC. The DOJ also objected to the IRC's inclusion of two cities, Casa Grande and Apache Junction, in District 23 because the total Anglo population reduced the Hispanic VAP. The IRC remedied this problem by incorporating the Minority Coalition's suggestion to remove Gold Canyon and southern Apache Junction from District 23 and place them into District 22. This change significantly overpopulated District 22, but the IRC compensated by shifting some areas of District 22 into District 19. This change also appeased representatives of the City of Casa Grande who were opposed to splitting the City from its surrounding communities. The third change extended District 23 into an Hispanic portion of the City of Avondale, thereby further increasing the District's Hispanic VAP. With these three changes the IRC restored District 23's Hispanic VAP to 30.63%, above the benchmark level, and, in combination with other minorities, made District 23 a majority-minority district in total minority population.[15]

---

**13.** The Court finds Mr. Johnson qualified to provide the opinions given and finds them reliable. *See* Fed.R.Evid. 702.

**14.** IRC 2001 Plan's Districts 27 and 29 were created out of a single, larger benchmark district.

**15.** Although the Hispanic VAP was only 30.63%, total minority population (but not

Johnson also explained the IRC's design for solving the problem districts in Maricopa County. He testified that the Commission redrew two districts in Maricopa County, Districts 13 and 14, again to meet the DOJ's remedial option of ensuring that there were three viable Hispanic districts in Arizona. To accomplish this, the IRC first determined that 55% Hispanic VAP was the threshold for Districts 13 and 14. Johnson revealed that the IRC arrived at the 55% figure by considering the input of the public, including the Minority Coalition, and was guided by the DOJ's objections. In particular, the DOJ had not objected to proposed District 16 at 59% Hispanic VAP, but had objected to proposed Districts 13 and 14 at 51%, and noted a benchmark district in Tucson that had an Hispanic VAP of 55%.

Johnson demonstrated that the IRC reached 55% Hispanic VAP in District 13 by removing communities such as Litchfield Park that were not heavily Hispanic. In exchange, District 13 acquired Hispanic communities in the southeast portion of the City of Glendale. Concomitant changes were made to District 14, which had only a 50.6% Hispanic VAP in the IRC 2001 Plan. Most of the changes occurred to District 15, which in his words became skinnier in shape. (R.T. 5/29/02 at 45). District 14 acquired Hispanic communities by extending eastward into District 15 and southward toward Van Buren Street in Phoenix into District 16, except that the Isaac School District community remained in District 16. Despite the incursion of District 14 into District 16, District 16 remained close to the 59% Hispanic VAP,

and also maintained the African–American population within the district.

In Johnson's opinion, the IRC's changes to Districts 23, 13, and 14 addressed the concerns raised in the DOJ's May 20 letter.

Before Johnson completed his testimony the videoconferencing link terminated, and attempts to reestablish it were unsuccessful. The Court permitted counsel for the IRC, without objection, to summarize the contents of the exhibits that Johnson would have relied upon for his summary and opinions. Counsel identified a slide depicting the demographic, population and boundary changes that resulted from the IRC's adjustments and described through another exhibit the final reconfigured map, showing the entire state with separate enlarged diagrams of the Tucson and Phoenix areas, i.e., the IRC's Proposed Plan Map.[16]

For its part, the Minority Coalition called Ronald Sissons as its expert. Sissons is employed by Research Advisory Services, which conducts geodemographic research.[17] His experience includes assisting the City of Phoenix with drawing lines for its City council elections. Sissons directed the Court's attention to a map of the eight Phoenix City council districts that the DOJ had precleared. (Ex. 145) Sissons compared the ideal population for each City council district of approximately 165,000 persons to the ideal population for an Arizona State legislative district, about 171,000 persons. He continued that the precleared County council districts 4, 5, 7 and 8 overlap approximately the same area

---

VAP), including African–Americans, exceeded 50%.

**16.** Counsel for the Minority Coalition was unable to cross-examine Johnson, but indicated that it would offer testimony from another witness on the relevant issues.

**17.** Sissons explained that geodemographic research includes the analysis of maps and data relating to such topics as school enrollment projections and political redistricting. The Court finds Mr. Sissons was qualified to provide the opinions given and finds them reliable. Fed.R.Evid. 702.

as do IRC's Proposed Plan Districts 13, 14, 15 and 16. He explained that some of the legislative districts may extend beyond the Phoenix City limits, accounting for some differences in the shapes and population of the legislative and City council districts.

Sissons showed the Court a table that he prepared that in relevant part compared the adopted and benchmark Hispanic VAP percentages in City council districts 4, 5, 7 and 8. (Ex. 142; R.T. 5/29/02 at 68) The table indicated that City council district 4 reflected an increase of Hispanic VAP to 51.44 %, compared to its benchmark district figure of 27.28%. In contrast, adopted City council districts 5, 7 and 8, showed decreases in their respective Hispanic VAP percentages from their benchmark percentages. Specifically, district 5's Hispanic VAP dropped from benchmark 42.38% to 33.04%. The Hispanic VAP in district 7 fell to 58.39% from benchmark 68.19%. Finally, City council district 8 now has an Hispanic VAP of 52.45% compared with the benchmark of 58.83%.

Mary Rose Garrido·Wilcox, an Hispanic and the chair of the Minority Coalition, also testified for the Coalition. She stated that she currently holds office as a Maricopa County supervisor in supervisorial district 5. In her words, the Minority Coalition was "totally involved" in the IRC's public sessions and with the guidance of the Mexican–American Legal Defense Fund, the group presented several maps to the IRC showing the Hispanic communities of interest the Minority Coalition sought to preserve.

Wilcox was first elected as a Supervisor in 1992 and was reelected in 1996. Her lowest margin of victory in a contested race was 58%. Prior to becoming a County Supervisor, Wilcox served as a Phoenix City council member beginning in 1983 and was reelected on four occasions. Wilcox ran and was elected in Maricopa County eight times, never losing an election. She showed the Court a map that she prepared shortly after the 2000 election to help gauge her election results in each precinct. The map indicated the areas where Wilcox garnered over 55% of the vote, between 50% and 55% of the vote, and the few areas where she lost. Wilcox then presented the Court with an exhibit demonstrating that the IRC 2001 Plan Districts 13, 14 and 16 were almost exclusively within her County Supervisor district 5.

Because of her background and experience Wilcox considered herself familiar with Phoenix City council districts, voter turnout and the opportunities for the election of Hispanics in those districts.[18] Wilcox recounted the names of Hispanics, some of whom currently hold office in the 1994 districts, who are running for office in the IRC Proposed Plan legislative districts 13, 14, 15 and 16. With respect to school districts within 1994 legislative districts 13 and 14, she noted that Hispanics hold two out of five positions on the Cartwright School District Board, almost a majority on the Tolleson School Board District and three out of five positions on both the Isaac School District Board and Phoenix Elementary School District Board. (*See* R.T. 5/29/02 at 83) Additionally, two Hispanics and an African–American from 1994 legislative district 16 serve on the Phoenix Union High School Board District. Wilcox testified that within 1994 legislative districts 13 and 14 Hispanics have a long tradition of representation in offices of Justice of the Peace, and an Hispanic from the portion of the City of Glendale within 1994 legislative district 13 is a member of the Glendale City Council. (*See id.* at 84).

**18.** The Court finds because of her experience that Wilcox was qualified to provide the opinions she gave and finds them·reliable. Fed. R.Evid. 701, and 702.

She testified that she witnessed a strong growth in the Hispanic community in Maricopa County in the past decade, particularly toward the end of the decade. Wilcox attributed her election success in large part to the migration of Hispanics in the 1990s northward past the historical boundary of McDowell Road in Phoenix, and into the areas of the City of Maryvale, 1994 legislative district 13, the City of Glendale and central Phoenix. (*See id.* at 85). Finally, Wilcox opined that Hispanics would have an equal opportunity to elect representatives of their choice to the Arizona legislature in light of the 55.19% Hispanic VAP in IRC Proposed Plan District 13 and the 55.16% Hispanic VAP in Proposed Plan District 14. (*See id.* at 86).

Pete Rios testified next for the Coalition. Presently, he is an Hispanic State senator from 1994 legislative district 7 and a member of the Minority Coalition. Rios was first elected to the State legislature in 1983 and, except for a two year period, has held this office for nine terms. The two year absence occurred because he ran for Secretary of State and won in the primary but in his words "got whooped" in the general election. In 1991 and 1992 Rios served as president of the Arizona senate. He also served several different times as assistant minority leader and minority whip.

Rios testified that he participated in the 2001 public sessions before the IRC. He recalled the shaping of the district that would incorporate legislative District 7 in the IRC 2001 Plan. The IRC eventually labeled it District 23 for both the IRC 2001 Plan and the IRC Proposed Plan. In the 1994 Plan legislative district 7 included the towns of San Manuel and Oracle, mining communities with sizeable Hispanic populations. Rios and the Coalition advocated for including these towns in District 23 to retain the communities of interest of Latino voters and the mining towns. Instead, the IRC 2001 Plan included the City of Casa Grande and excluded the San Manuel and Oracle communities. Rios also spoke at the IRC's meetings held the week of May 20 to May 24, again advocating for the inclusion of San Manuel and Oracle in District 23. His position was reinforced by the a map submitted to the IRC by the Coalition on May 22 including the two towns and removing Gold Canyon Ranch and part of Apache Junction from the District. The IRC ultimately incorporated these suggestions into the IRC's Proposed Plan for District 23, raising the Hispanic VAP in District 23 in the IRC's 2001 Plan from approximately 25% to roughly 30%.

Although the final Hispanic VAP percentage was below 55% in the IRC's Proposed Plan for District 23, Rios believed that Hispanics would be able to elect candidates of their choice in light of their historical success in electing such candidates in the 1994 district 7.[19] Rios pointed out that his daughter served three two-year terms as a legislative representative in district 7 under the 1994 Plan. Several other Hispanic representatives were elected from the same district even though in the last twenty years the Hispanic VAP has not been near 50% in that district.

Ramon Valadez was called as Coalition's last witness, an Hispanic State senator from 1994 district 10 in Tucson and a member of the Coalition. Valadez was first elected to office in 1996 as a representative from district 10, which roughly corresponds to District 29 in the IRC Proposed Plan. Valadez has been elected to office three times and serves as the co-chair of the senate campaign to elect democrats to the State senate. (*See id.* at 98–99). In the course of this and other cam-

---

19. Because of his experience and background the Court finds that he was qualified to provide the opinions given and finds them reliable. Fed.R.Evid. 701, and 702.

paigns, Valadez has become familiar with legislative districts throughout the State and particularly his district. Valadez referred to a map of IRC Proposed Plan District 29 with an overlay of Supervisorial district 2 in Tucson. Valadez indicated that the boundaries of these districts matched up well. He also testified that he was familiar with the performance of precincts in Proposed Plan District 29. He offered the opinion that Hispanics would have an equal opportunity to elect representatives of their choice in IRC Proposed Plan District 29, even though the Hispanic VAP for that District was only approximately 45%.[20]

### (3) Section 5 Retrogression

In a Section 5 analysis, the Court looks to whether the IRC's Proposed Plan will have the effect of denying or abridging the right to vote on account of race or color. *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976). This inquiry requires that the Court analyze whether the Plan causes a retrogression in minority voting strength. *See Colleton County Council v. McConnell,* 201 F.Supp.2d 618, 644 (D.S.C.2002). The Court begins by identifying the benchmark plan and comparing it with the proposed plan to measure retrogressive effect. *See id.* Here the benchmark districts are the 1994 legislative districts, found to comply with the United States Constitution and Voting Rights Act in 1992 in *Arizonans for Fair Representation v. Symington,* 1993 WL 375329 (D.Ariz. June 19, 1992).

The Court's benchmark and IRC Proposed Plan district comparisons and analy-

sis were complicated by the Arizona Constitution's requirement that the IRC draw districts from a "clean slate" and without regard to incumbency. ARIZ. CONST. art. IV, Pt. 2, § 1(14), (15). The IRC's compliance with this demand resulted in new districts with lines that were drastically different from their predecessors and created from portions of many benchmark districts. For instance, Plan District 15 is composed of parts of benchmark districts 18, 10, 23, 25 and 26. The DOJ conducted their analysis of the drastically changed districts by identifying eight 1994 districts (districts 3, 5, 7, 8, 10, 11, 22 and 23) in which minority voters had the ability to elect the candidate of their choice and deciding that eight effective districts was the benchmark goal. (Ex. 504 at 2). The DOJ approved of five of the ten districts in the IRC 2001 Plan as districts in which minorities could elect the candidate of their choice, leaving five districts (Districts 13, 14, 15, 23 and 29) that did not meet the mark. For these five objected-to districts the IRC chose the DOJ's afforded option of restoring three IRC 2001 districts, Districts 13, 14 and 23, to their benchmark levels.

The parties stipulated that Districts 13, 14 and 23 in the IRC Proposed Plan are "effective" for Hispanics. (Ex. 504; Docket # 108 at 6)[21] IRC expert Doug Johnson opined that the changes to these Districts addressed the concerns of retrogression raised in the DOJ's May 20th letter, and his opinion was corroborated by other opinion testimony, and the Special Master's findings.[22] Accordingly, the Court

---

**20.** The Court finds that because of his background and experience he is qualified to provide the opinions given and finds them reliable. Fed.R.Evid. 701, and 702.

**21.** The term "effective" meaning that Hispanics will be able to elect the candidate of their choice was used by the Special Master and

was repeated by the parties in their stipulation of facts and law.

**22.** Although Senator Rios' testimony and the DOJ's letter suggested retrogressive intent in the IRC's 2001 Plan for District 23, the evidence did not support this inference for the IRC Proposed Plan.

finds the IRC Proposed Plan was not adopted with retrogressive intent. *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 340, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000). The Court also finds that the IRC Proposed Plan does not have the prohibited effect of retrogression because the evidence persuaded the Court that in the three districts chosen to remedy the DOJ objections Hispanics have a fair opportunity to be elected. *Id.* at 328, 120 S.Ct. 866.

### CONCLUSION

The Court considered all evidence admitted in conjunction with these proceedings and authorized the Arizona Secretary of State to use the IRC Proposed Plan for interim use in the 2002 legislative primary and general elections. Further, the Court ordered that members of the Arizona legislature elected in 2002 pursuant to the Plan shall serve for a two-year term beginning in January 2003, and the Court granted the Counties' motion for emergency relief for the conduct of the 2002 elections.[23]

---

**23.** The Court commends the attorneys and parties for working diligently, cooperatively, and with ingenuity to narrow the issues regarding the DOJ's objections and for compromising on an interim plan for the 2002 elections. What was initially anticipated to be lengthy litigation was significantly diminished by the DOJ's May 20, 2002, letter preclearing twenty-five of the thirty legislative districts in the IRC's 2001 Plan. The IRC, however, immediately undertook appropriate action in response to the DOJ's objections, held lengthy emergency sessions to address the DOJ's concerns, and considered public comment, including the suggestions of the Minority Coalition and Arizonans for Fair and Legal Redistricting, Inc., before reconfiguring the affected districts. Finally, the participation of all the parties in quickly dispatching all necessary information to the Special Master enhanced the expedited decision of this Court, and served the best interests of the State of Arizona.