75 P.3d 1088

THE ARIZONA INDEPENDENT
REDISTRICTING COMMIS-
SION, Petitioner,

v.

The Honorable Kenneth W. FIELDS,
Judge of the Superior Court of the State
of Arizona, in and for the County of
Maricopa, Respondent Judge,

Arizona Minority Coalition for Fair Redis-
tricting; The Navajo Nation, the Hopi
Tribe; The San Carlos Apache Tribe;
The Arizona Secretary of State; The
City of Flagstaff; The City of Prescott;
The Town of Prescott Valley; The Town
of Chino Valley; The City of Kingman;
The City of Lake Havasu City; Mohave
County; Apache County; Greenlee
County; Graham County; Santa Cruz
County; Arnold Estrada, et al.; Joseph
Ricarte, et al.; Jaime Abeytia, et al.;
and Arizonans for Fair and Legal Redis-
tricting, Real Parties in Interest.

No. 1CA–SA 03–0085.

Court of Appeals of Arizona.
Division 1, Department C.

Sept. 16, 2003.

Gammage & Burnham, P.L.C., By Lisa T. Hauser, Cameron C. Artigue, Leonard W. Aragon, Phoenix, for Petitioner.

Haralson Miller Pitt & McAnally, PC, By Jose De Jesus Rivera, Phoenix, Co–Counsel for Petitioner.

Brown & Bain, P.A., By Paul F. Eckstein, Michael S. Mandell, Phoenix, for Real Party in Interest Arizona Minority Coalition.

Lewis and Roca, LLP, By Richard A. Halloran, James A. Martin, Joshua Grabel, Phoenix, for Real Party in Interest Arizona Minority Coalition.

Law Office of Aaron Kizer, PLC, By Aaron Kizer, Phoenix, Co–Counsel for Real Party in Interest Arizona Minority Coalition.

Law Offices of Neil Vincent Wake, By Neil Vincent Wake, Phoenix, for Real Party in

Interest Arizonans for Fair/Legal Redistricting.

Joseph Bertoldo, Flagstaff City Attorney, By Joseph Bertoldo, Flagstaff, for Real Party in Interest City of Flagstaff.

Jennings, Strouss & Salmon, P.L.C., By David B. Earl, Ernest Calderon, David J. Cantelme, Phoenix, for Real Party in Interest City of Flagstaff.

Arizona State Legislature, By Donald W. Jansen, Greg Jernigan, Glenn Davis, Phoenix, for Arizona State Legislature.

## OPINION

TIMMER, Presiding Judge.

¶ 1 In this special action, the Arizona Independent Redistricting Commission ("IRC") challenges the trial court's order granting a motion by the Arizona Minority Coalition for Fair Redistricting ("Coalition") to compel the IRC to produce documents exchanged between the IRC, its consultants, and expert witnesses. The IRC claims that the requested documents are protected from disclosure by legislative, deliberative process, attorney-client, and work-product privileges. The trial court found that none of these privileges applied to immunize the documents from disclosure. We decide that communications between the IRC and its consultants are subject to the protection afforded by the legislative privilege. While we do not decide the applicability of the deliberative process privilege, the attorney-client and work-product privileges are inapplicable. Additionally, by designating consulting experts as testifying experts, the IRC waived any legislative privilege attaching to communications with those experts, or any materials reviewed by them, that relate to the subject of the experts' testimony.

¶ 2 For the reasons that follow, we accept jurisdiction and grant relief to the IRC in the manner described hereafter. See infra ¶ 51.

## BACKGROUND

¶ 3 Since the grant of statehood, Arizona voters living in artificially drawn districts have selected residents from those districts to serve in Congress and the state legislature. Ariz. Const. art. IV, Pt. 2, § 1(1), (2) (historical notes to 2000 amendment). Historically, and in recognition of population changes, our legislature undertook the task of redrawing these districts from time to time. Id. Because of past violations of the Voting Rights Act, 42 U.S.C. § 1973c (1994), Section 5 of the Act requires Arizona to submit such redistricting plans for preclearance to either the United States Department of Justice ("DOJ") or the District Court for the District of Columbia. Navajo Nation v. Arizona Indep. Redistricting Comm'n, 230 F.Supp.2d 998, 1001 (D.Ariz.2002). Since 1980, the legislature has submitted such plans to the DOJ. Id.

¶ 4 In November 2000, Arizona voters passed Proposition 106, which amended the constitution by creating the IRC and assigning to it the redistricting task. Ariz. Const. art. IV, Pt. 2, § 1(3) (historical notes to 2000 amendment). The IRC is thus a constitutional body that consists of five appointed volunteers who serve concurrent, ten-year terms. Ariz. Const. art. IV, Pt. 2, §§ 1(3), (23). The IRC members are not required to have any expertise in the redistricting process. Ariz. Const. art. IV, Pt. 2, § 1(3). However, the constitution authorizes the IRC to hire staff, consultants, and attorneys to assist it. Ariz. Const. art. IV, Pt. 2, § 1(19).

¶ 5 The IRC must ensure that configuration of the districts complies with the United States Constitution and the Voting Rights Act. Ariz. Const. art. IV, Pt. 2, § 1(14)(A). Furthermore, "[t]he IRC must attempt to create competitive districts to the extent practicable" when doing so would not create a significant detriment to other factors, such as compactness, contiguity, and communities of interest. Navajo Nation, 230 F.Supp.2d at 1002; see also Ariz. Const. art. IV, Pt. 2, § 1(14)(A)-(F).

¶ 6 The 2000 decennial census revealed substantial population growth in Arizona and shifts within pre-existing districts. Navajo Nation, 230 F.Supp.2d at 1002. As a result, redistricting was required. Id. Consequently, in April 2001, the IRC retained National Demographics Corporation ("NDC") to serve as the lead consultant to the IRC in the redistricting process. Among other tasks,

NDC assisted the IRC in creating an equal-population grid, drafting congressional and legislative maps, testing alternatives, and preparing final congressional and legislative redistricting plans for submission to the DOJ. NDC also assisted the IRC staff in soliciting and digesting public input on proposed representational lines. After holding a series of public hearings, the IRC adopted a redistricting plan in October 2001, which was ultimately submitted to the DOJ for preclearance. *Id.* In March 2002, the DOJ approved part of the plan, but reserved judgment on the remaining portion pending receipt of additional information. *Id.* at 1003.

¶ 7 Pending preclearance from the DOJ, the Coalition and other parties filed a complaint against the IRC in March 2002, alleging that the IRC violated the Arizona Constitution by failing to make the legislative districts sufficiently competitive. *Id.* at 1002. When the Coalition sought to depose the IRC members and NDC consultants and obtain responses to written discovery requests, the IRC moved the court for an order precluding discovery concerning "legislative acts." On April 15, the court granted the motion as to the commissioners but ruled that the Coalition could depose the consultants. On April 30, the court clarified that it "does not view the consultants ... as legislative aides entitled to a deliberative process privilege." Accordingly, the Coalition deposed NDC consultants Douglas Johnson, and Drs. Alan Heslop, Michael McDonald, and Lisa Handley. The IRC later designated these consultants as expert witnesses for purposes of testifying at the trial in this case.

¶ 8 In September 2002, in light of looming primary and general elections, the IRC obtained federal district court approval for an interim redistricting plan for use in these elections. *Navajo Nation*, 230 F.Supp.2d at 1016. The IRC then adopted a new redistricting plan for use in 2004 through 2010. The Coalition and other plaintiffs amended their complaints in this case to challenge the new plan.

¶ 9 The Coalition submitted a document request to the IRC seeking "all documents, communications, etc., that have been withheld for privilege," including "all email communications pertaining to redistricting contained on Doug Johnson's computer in California." On February 24, 2003, the IRC produced two binders of documents but withheld documents exchanged with NDC and its counsel on the basis of multiple privileges. According to the IRC, most of these documents are paper print-outs of electronic mail.

¶ 10 On March 4, the Coalition filed a motion to compel production of all documents that were created by, or provided to, the IRC's testifying expert witnesses, as well as all communications with the IRC's vendors, including NDC. The trial court granted the Coalition's motion to compel on March 21, ruling that while the IRC has a privilege for its deliberative process, that privilege does not extend to communications with its consultants. The court additionally found that the requested documents are not protected by the attorney-client or work-product privileges, and that all communications between IRC's expert witnesses and counsel are discoverable. This special action followed, and we entered an order staying the trial court's discovery order pending our resolution of the issues. On May 30, 2003, the IRC removed the case to the Arizona District Court. By order dated September 5, 2003, that court remanded the matter to the superior court, thereby revesting jurisdiction in this court.

## SPECIAL ACTION JURISDICTION

¶ 11 The exercise of special action jurisdiction is appropriate to review an order compelling discovery over the objection of a party asserting privileges because that party has no equally plain, speedy, or adequate remedy by appeal. *Twin City Fire Ins. Co. v. Burke*, 204 Ariz. 251, 252, ¶ 3, 63 P.3d 282, 283 (2003) (citation omitted). Special action review is also appropriate to resolve constitutional issues of first impression and of statewide importance, such as the ones presented by the IRC's petition. *See Martin v. Reinstein*, 195 Ariz. 293, 300–01, ¶ 10, 987 P.2d 779, 786–87 (App.1999) (citation omitted).

¶ 12 Nevertheless, the Coalition urges us to decline jurisdiction under the doctrine of laches because the IRC unreasonably delayed seeking relief by not petitioning for review of the court's April 30, 2002, ruling that the IRC's communications exchanged with the NDC consultants are not shielded by a deliberative process privilege. We agree that the IRC could have obtained judicial resolution of many of the issues now before us by seeking review of this earlier order. We are additionally concerned that these proceedings might delay the trial in this case. Notwithstanding, courts should hesitate to enforce a claim of laches against a public body that is asserting privileges designed to serve the public interest. *See Maricopa County v. Cities and Towns of Avondale*, 12 Ariz.App. 109, 113, 467 P.2d 949, 953 (1970) (laches cannot "be asserted to gain rights against the public or defeat the public interest"); *see also George v. Arizona Corp. Comm'n*, 83 Ariz. 387, 392, 322 P.2d 369, 372 (1958) (same). We therefore reject the Coalition's laches argument and accept special action jurisdiction of the IRC's petition.

## DISCUSSION

¶ 13 The IRC argues that the trial court erred by compelling production of documents exchanged between the IRC and NDC because those documents are exempt from disclosure under the legislative, deliberative process, attorney-client, and work-product privileges. The IRC additionally contends that it did not waive any of these privileges by designating NDC consultants as testifying expert witnesses.

¶ 14 The existence of an evidentiary privilege is a question of law, which we review de novo. *Twin City Fire Ins. Co.*, 204 Ariz. at 253, ¶ 10, 63 P.3d at 285 (citation omitted). Whether a party has waived a privilege is a mixed question of fact and law that we likewise review de novo. *Id.* (citation

omitted). Because the public generally "has a right to every man's evidence," we narrowly construe constitutional, common law, and statutory privileges "for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 709–10, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (citation omitted). With these principles in mind, we address the applicability of each claimed privilege and then decide whether the IRC waived any privilege by its expert witness designations.

### A. Legislative Privilege

#### 1. Overview

¶ 15 The so-called "legislative privilege" asserted by the IRC stems from the doctrine of legislative immunity, which in turn springs from common law and is embodied in the Speech or Debate Clause of the United States Constitution [1] and the principles underlying our government's separation of powers. *See Bogan v. Scott–Harris*, 523 U.S. 44, 48–49, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998) (citation omitted) (recognizing that legislative immunity " 'has taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries' and was 'taken as a matter of course by those who severed the Colonies from the Crown and founded our Nation.' "); *United States v. Johnson*, 383 U.S. 169, 177–78, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966) (tracing origins of Speech or Debate Clause to English Bill of Rights of 1689 and Articles of Confederation and noting that clause reinforces separation of powers).[2] Thus, when members of Congress are acting within their "legitimate legislative sphere," the Speech or Debate Clause serves as an absolute bar to criminal prosecution or civil liability. *Gravel v. United States*, 408 U.S. 606, 624, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972); *see also Johnson*, 383 U.S. at 180, 184–85, 86 S.Ct. 749 (Speech or Debate Clause barred criminal prosecution); *Doe v. McMillan*, 412 U.S. 306, 312–13, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973) (Speech or Debate Clause barred civil prosecution).

---

1. The Speech or Debate Clause of the United States Constitution, art. I, § 6, cl. 1, provides, in pertinent part, as follows: "[F]or any Speech or Debate in either House, [senators and representatives] shall not be questioned in any other Place."

2. A thorough history of the origins of legislative immunity is set forth in *Holmes v. Farmer*, 475 A.2d 976, 980–82 (R.I.1984).

¶ 16 The United States Supreme Court has held that common law legislative immunity similar to that embodied in the Speech or Debate Clause exists for state legislators acting in a legislative capacity. *Bogan,* 523 U.S. at 49, 118 S.Ct. 966. Additionally, most states, including Arizona,[3] have preserved this common law immunity in state constitutions. *Tenney v. Brandhove,* 341 U.S. 367, 375 n. 5, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) (listing states with constitutional provisions embodying legislative immunity); *Sanchez v. Coxon,* 175 Ariz. 93, 95, 854 P.2d 126, 128 (1993) (recognizing Arizona Constitution as source of immunity for state legislators). Thus, the legislative immunity shielding members of the Arizona legislature is rooted in both federal common law and the Arizona Constitution.[4]

¶ 17 The legislative immunity doctrine also functions as a testimonial and evidentiary privilege. *Marylanders For Fair Representation, Inc., v. Schaefer,* 144 F.R.D. 292, 297 (D.Md.1992). Accordingly, a state legislator engaging in legitimate legislative activity may not be made to testify about those activities, including the motivation for his or her decisions. *Id.; Steiger v. Superior Court,* 112 Ariz. 1, 3, 536 P.2d 689, 691 (1975); *Dombrowski v. Eastland,* 387 U.S. 82, 84–85, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (noting legislators "should be protected not only from the consequences of litigation's results but also from the burden of defending themselves"). Likewise, evidence of legislative acts may not be introduced against a legislator in any judicial proceeding. *See United States v. Helstoski,* 442 U.S. 477, 487–88, 99 S.Ct. 2432, 61 L.Ed.2d 12 (1979). The privilege is not intended to protect legislators' individual interests, "but to support the rights of the people, by enabling

their representatives to execute the functions of their office without fear of prosecutions, civil or criminal." *Coffin v. Coffin,* 4 Mass. 1, 27 (1808).

¶ 18 This legislative privilege does not extend to cloak "all things in any way related to the legislative process." *Steiger,* 112 Ariz. at 4, 536 P.2d at 692. Rather, the privilege extends to matters beyond pure speech or debate in the legislature only when such matters are "an integral part of the deliberative and communicative processes" relating to proposed legislation or other matters placed within the jurisdiction of the legislature, *Gravel,* 408 U.S. at 625, 92 S.Ct. 2614 and "when necessary to prevent indirect impairment of such deliberations." *Id.* (citation omitted). The privilege does not apply to "political" acts routinely engaged in by legislators, such as speech-making outside the legislative arena and performing errands for constituents. *United States v. Brewster,* 408 U.S. 501, 512, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972) (providing examples of "political" acts). Similarly, the privilege does not apply to the performance of "administrative" tasks. *Bryan v. City of Madison,* 213 F.3d 267, 273 (5th Cir.2000).

¶ 19 The IRC argues that the trial court erred by compelling production of documents exchanged between the IRC and NDC because such communications are protected by the legislative privilege. According to the IRC, because NDC assisted the IRC in performing legislative tasks, the legislative privilege extends to protect their communications and acts undertaken during the redistricting process. The Coalition does not contest for purposes of the discovery dispute that the IRC is entitled to assert the legislative privi-

---

3. The Speech or Debate Clause in the Arizona Constitution, art. IV, Pt. 2, § 7, provides: "No member of the Legislature shall be liable in any civil or criminal prosecution for words spoken in debate."

4. As the Coalition noted at oral argument before this court, Arizona's Speech or Debate Clause differs from its federal counterpart by not explicitly prohibiting the questioning of legislators. This distinction is not significant. By the time the Framers convened the Arizona Constitutional Convention in 1910, the Supreme Court had lib-

erally construed the federal Speech or Debate Clause to protect against inquiry about the exercise of legislative functions. *Kilbourn v. Thompson,* 103 U.S. 168, 202–04, 26 L.Ed. 377 (1880). The records of the Convention do not reflect that the Framers intended a more restrictive interpretation of the state provision. Consequently, cases construing the federal Speech or Debate Clause and the federal common law are persuasive in interpreting the scope of the immunity and privilege afforded by the Arizona Constitution.

lege, but contends that the privilege does not extend to NDC as an independent contractor. The Coalition alternatively asserts that if the privilege extends to NDC, the privilege does not protect against the disclosure of documents. Before deciding the applicability of the legislative privilege to NDC and its scope, however, we first address the City of Flagstaff's[5] contention that the IRC commissioners do not hold a legislative privilege, and such a privilege therefore cannot extend to NDC. See Gravel, 408 U.S. at 613, 92 S.Ct. 2614 (addressing applicability and scope of Senator's privilege before addressing claim that aide had derivative privilege).

### 2. Applicability to the IRC

¶ 20 The City first asserts that because the IRC commissioners are appointed rather than elected, they are not entitled to assert the legislative privilege. We reject this argument. The Supreme Court has developed a "functional" approach to determine who may assert the legislative privilege, which is not dependent on the manner of selection for office. Lake Country Estates, Inc., v. Tahoe Reg'l Planning Agency, 440 U.S. 391, 405 and n. 30, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). Under this approach, a public official who acts in a legislative capacity may assert the legislative privilege regardless of his or her particular location within government. Id. Applying this analysis, the Court has extended the privilege to appointed members of an interstate regional planning agency who serve in a legislative capacity. Id. at 400, 405–06, 99 S.Ct. 1171. Thus, the mere fact that the IRC commissioners are appointed rather than elected does not strip them of any entitlement to assert the legislative privilege.[6]

¶ 21 The City also argues that the IRC does not perform any legislative acts and consequently is not entitled to assert the legislative privilege. Specifically, the City contends that because our constitution expressly directs the IRC in the redistricting process, the IRC performs an administrative function rather than a legislative function by implementing this directive. Bryan, 213 F.3d at 273. Whether an act is "legislative" depends on the nature of the act. Bogan, 523 U.S. at 54, 118 S.Ct. 966. An act is legislative in nature when it bears the "hallmarks of traditional legislation" by reflecting a discretionary, policymaking decision that may have prospective implications, id. at 55–56, 118 S.Ct. 966 as distinguished from an application of existing policies, Crymes v. DeKalb County, 923 F.2d 1482, 1485 (11th Cir.1991) (citation omitted), such as the creation of administrative rules to implement legislative policies. Further, a legislative act occurs in "a field where legislators traditionally have power to act." Bogan, 523 U.S. at 56, 118 S.Ct. 966.

¶ 22 The IRC's redistricting acts are legislative in nature. Although the constitution provides a framework for the redistricting task, along with multiple goals for establishing districts, the commissioners exercise discretionary, policymaking decisions within that framework to balance these goals and arrive at a final redistricting plan. See, e.g., Ariz. Const. art. IV, Pt. 2, § 1(14)(F) ("To the extent practicable, competitive districts should be favored where to do so would create no significant detriment to the other goals."). Thus, the IRC does not, as the City suggests, merely implement an established redistricting policy.

¶ 23 Additionally, the redistricting plan has the force of law, with prospective application.

---

5. The City of Flagstaff is a plaintiff in this case and has intervened in the special action.

6. Our supreme court's decision in Grimm v. Arizona Bd. of Pardons and Paroles, 115 Ariz. 260, 564 P.2d 1227 (1977), cited by the City to support its position, does not mandate a different result. In Grimm, the court retreated from its previous extension of absolute judicial immunity to public officials for their discretionary acts. Id. at 265–66, 564 P.2d at 1232–33. In light of the increasing power wielded by governmental offi-

cials without corresponding accountability or checks on that power, the court reasoned that qualified immunity for such officials was appropriate. Grimm, 115 Ariz. at 266, 564 P.2d at 1233. Thus, the court concluded that "absolute immunity for nonjudicial, nonlegislative officials is outmoded and even dangerous." Id. Nothing in Grimm, however, indicates that the court intended to restrict legislative privilege to elected legislators. Indeed, the court did not discuss legislative privilege.

Ariz. Const. art. IV, Pt. 2, § 1(17) ("[t]he provisions regarding this section are self-executing").[7] Undeniably, enacting laws is an act traditionally performed by the legislature. Indeed, prior to the 2000 amendment to our constitution, the legislature undertook the redistricting task. *See supra* ¶ 3. For these reasons, we conclude that the IRC performs legislative acts when formulating a redistricting plan.[8]

¶ 24 In conclusion, the IRC commissioners, who are constitutional officers, are cloaked with legislative privilege for actions that are "an integral part of the deliberative and communicative processes" utilized in developing and finalizing a redistricting plan, and "when necessary to prevent indirect impairment of such deliberations." *Gravel,* 408 U.S. at 625, 92 S.Ct. 2614. We now decide whether that privilege extends to independent consultants, such as NDC.

### 3. Applicability to consultants

▇ ¶ 25 The IRC argues that the trial court erred by refusing to extend the legislative privilege to shield communications between the IRC and NDC consultants. The Coalition responds that the privilege cannot shield independent consultants because they are not "direct participant[s] in the legislative process," but are, rather, mere providers of information and services. In an *amicus curiae* brief, members of the Arizona Legislature urge us to extend the privilege to outside consultants "as long as some authority has been delegated by the Legislature or a member for the [consultant] aide to engage in legislative acts." Our resolution of this issue is guided by the Court's decision in *Gravel.* 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583.

¶ 26 The dispute in *Gravel* arose from Senator Mike Gravel's acts of reading aloud from the so-called "Pentagon Papers"[9] during a hearing of a Senate subcommittee chaired by the senator, and then placing that document in the public record. 408 U.S. at 609, 92 S.Ct. 2614. Earlier in the day of the hearing, Senator Gravel added to his staff Dr. Leonard S. Rodberg, a resident fellow at the Institute of Policy Studies, to assist the senator in preparing for and conducting the hearing. *Id.* at 608, 609, 92 S.Ct. 2614. Later, when a federal grand jury probing the release of the Pentagon Papers subpoenaed Dr. Rodberg, Senator Gravel intervened and moved to quash the subpoena as violating the senator's legislative privilege. *Id.* at 608–09, 92 S.Ct. 2614. Thus, one issue before the Court was whether Dr. Rodberg's acts were protected from inquiry by the legislative privilege. *Id.* at 613, 92 S.Ct. 2614.

¶ 27 The Court held that although the privilege was personal to Senator Gravel, and invocable only by him or an aide on his behalf, the privilege extended to Dr. Rodberg insofar as his conduct would be protected legislative acts if performed by the senator. *Id.* at 616, 618, 621–22, 92 S.Ct. 2614. The Court deemed this extension necessary in light of modern legislators' need for assistance in performing increasingly complex and proliferating legislative tasks. *Id.* at 616–17, 92 S.Ct. 2614 (citation omitted) (agreeing that "for the purpose of construing the privilege a [congressional] Member and his aide are to be 'treated as one' "); *see also Steiger,* 112 Ariz. at 3, 536 P.2d at 691 (same).

¶ 28 The Court's holding in *Gravel* turned on the function fulfilled by Dr. Rodberg rather than his job title. *Id.* at 621–23, 92 S.Ct. 2614. Thus, we are not persuaded by the Coalition's argument that the legislative privilege can never extend to protect the legislative acts of a retained consultant. We

---

7. A "self-executing" constitutional provision is immediately effective without the necessity of ancillary legislation. *See Calmat of Arizona v. State ex rel. Miller,* 176 Ariz. 190, 192, 859 P.2d 1323, 1325 (1993).

8. Other courts have reached similar decisions. *See Marylanders For Fair Representation,* 144 F.R.D. at 301 (deciding Governor's preparation and presentation of legislative redistricting plan to General Assembly was legislative act); *In re Perry,* 60 S.W.3d 857, 860–61 (Tex.2001) (holding redistricting performed by redistricting board a legislative function under Texas constitutional scheme).

9. The Pentagon Papers was a classified Defense Department study formally titled "History of the United States Decision–Making Process on Viet Nam Policy." *Gravel,* 408 U.S. at 608, 92 S.Ct. 2614.

discern no practical difference, for purposes of applying the privilege, between placing a consultant temporarily "on staff," as Senator Gravel did with Dr. Rodberg, and retaining that same consultant as an independent contractor, as the IRC did with NDC. The manner of employment does not affect the consultant's function within the legislative process. Or, as succinctly phrased by the IRC, "[f]unction trumps title."

¶ 29 Moreover, as the members of the Arizona Legislature point out, the modern, part-time legislature, in light of budgetary constraints, contracts with expert consultants on a variety of subjects rather than retaining staff with such expertise. Thus, applying the cramped interpretation of the legislative privilege urged by the Coalition would constrain legislators from freely engaging in legislative acts without the threat of executive or judicial oversight; the core concern of legislative privilege. *See Gravel,* 408 U.S. at 618, 92 S.Ct. 2614 (noting Court has traditionally interpreted privilege to implement "fundamental purpose of freeing the legislator from executive and judicial oversight that realistically threatens to control ... conduct as a legislator").

▬ ¶ 30 For all these reasons, we decide that a legislator may invoke the legislative privilege to shield from inquiry the acts of independent contractors retained by that legislator that would be privileged legislative conduct if personally performed by the legislator. The privilege is held solely by the legislator and may only be invoked by the legislator or by an aide on his or her behalf. *Id.* at 621–22, 92 S.Ct. 2614. Therefore, to the extent the IRC engaged NDC to perform acts that would be privileged if performed by the commissioners themselves, these acts are protected by legislative privilege.

### 4. Applicability to documents

¶ 31 The Coalition alternatively argues that even assuming the applicability of the legislative privilege to NDC, the privilege is only testimonial and evidentiary in nature and does not shield documents from disclosure. The IRC maintains that the privilege would be illusory if communications otherwise protected from inquiry were discoverable if in written form. Neither the Supreme Court nor any Arizona court has addressed this issue, and other courts have reached differing resolutions of the issue.[10]

▬ ¶ 32 We are persuaded the legislative privilege protects against disclosure of documents in appropriate circumstances. The Supreme Court has held that the privilege applies to forbid questioning of witnesses concerning a legislator's conduct in performing legislative acts and communications between a legislator and his or her aides during their term of employment and related to any legislative act. *Gravel,* 408 U.S. at 628–29, 92 S.Ct. 2614. Documentary evidence of such conduct and communications can be as revealing as oral testimony. *Brown & Williamson Tobacco Corp. v. Williams,* 62 F.3d 408, 420 (D.C.Cir.1995). Even though such documents will not be used in any evidentiary proceeding, their mere disclosure could "chill" legislators from freely engaging in the deliberative process necessary to the business of legislating. *See*

---

**10.** For cases supporting the Coalition's position, see *In re Grand Jury (Granite Purchases for State Capital–Grand Jury Subpoena No. 86–1),* 821 F.2d 946, 953 n. 4 (3d Cir.1987) ("Our precedents have suggested that the privilege is primarily one of non-evidentiary use, not one of non-disclosure"); *In re Grand Jury Investigation,* 587 F.2d 589, 597 (3d Cir.1978) (reasoning that privilege not designed to encourage confidences by maintaining secrecy "for the legislative process in a democracy has only a limited toleration for secrecy."); *see also In re Grand Jury Proceedings,* 563 F.2d 577, 584 (3d Cir.1977); *Small v. Hunt,* 152 F.R.D. 509, 513 (E.D.N.C.1994); *Marylanders for Fair Representation,* 144 F.R.D. at 301 n. 20.

For cases supporting the IRC's position, *see Brown & Williamson Tobacco Corp., v. Williams,* 62 F.3d 408, 420, 421 (D.C.Cir.1995) (holding documentary evidence can be as revealing as oral communications and thus documents in hands of congressional members discoverable "only if the circumstances by which they come can be thought to fall outside 'legislative acts' or the legitimate legislative sphere"); *see also Simpson v. City of Hampton,* 166 F.R.D. 16, 19 (E.D.Va.1996); *In re Perry,* 60 S.W.3d at 861–62; *Humane Society v. City of New York,* 188 Misc.2d 735, 729 N.Y.S.2d 360, 364 (Sup.Ct.2001); *Campaign for Fiscal Equity v. State,* 179 Misc.2d 907, 687 N.Y.S.2d 227, 231 (Sup.Ct.1999).

*Gravel,* 408 U.S. at 618, 92 S.Ct. 2614; *Tenney,* 341 U.S. at 373, 71 S.Ct. 783 (noting privilege designed to enable legislator to enjoy fullest liberty of speech in discharge of duties without threat of "resentment of every one, however powerful, to whom the exercise of that liberty may occasion offense.") (citation omitted). Therefore, to the extent the legislative privilege protects against inquiry about a legislative act or communications about that act, the privilege also shields from disclosure documentation reflecting those acts or communications.

## B. Deliberative Process Privilege

 ¶ 33 The IRC also argues that the trial court erred by compelling disclosure of the contested documents because they are protected by the "deliberative process privilege." The deliberative process privilege is a federal common law privilege preserved in "Exemption 5" of the Freedom of Information Act, 5 U.S.C. § 552(b)(5) (1996) ("FOIA"), which shields from mandatory disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." *Paisley v. CIA,* 712 F.2d 686, 697 (D.C.Cir.1983) *vacated in part by* 724 F.2d 201 (1984); *Branch v. Phillips Petroleum Co.,* 638 F.2d 873, 881–82 (5th Cir.1981). The privilege is a qualified one, *FTC v. Warner Communications, Inc.,* 742 F.2d 1156, 1161 (9th Cir.1984), and is designed to promote open and frank discussion among government decision-makers by reducing fears that "each remark is a potential item of discovery and front page news." *Dep't of the Interior v. Klamath Water Users Protective Assoc.,* 532 U.S. 1, 8–9, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001). Thus, unless the privilege is overcome, it protects from disclosure materials that are both predecisional and reflective of a government official's deliberative process, which are opinions, recommendations, or advice about agency policies. *NLRB v. Sears, Roebuck &*

Co., 421 U.S. 132, 151–54, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); *FTC,* 742 F.2d at 1161.

¶ 34 The Coalition contends that the deliberative process privilege does not cloak any IRC documents because Arizona's public records law, A.R.S. § 39–121 to –161 (2001 & Supp 2002), does not contain a provision equivalent to Exemption 5 of FOIA, and Arizona courts have not acknowledged a ·common law privilege. *See Star Pub'g Co. v. Pima County Attorney's Office,* 181 Ariz. 432, 434, 891 P.2d 899, 901 (App.1994) (noting Arizona courts have not passed on viability of deliberative process privilege). We need not consider whether a deliberative process privilege exists in Arizona. Even assuming its viability, the IRC does not contend this privilege affords any more protection than the legislative privilege, which we have found can apply to shield IRC documents from disclosure. Thus, we leave the issue for resolution in another case.

## C. Common Interest Doctrine

¶ 35 The IRC next contends that the trial court erred by compelling disclosure of documents protected by the attorney-client and/or work product privileges, as extended through the "common interest doctrine." [11] The Coalition responds that the communications between the IRC and NDC did not concern a common interest, and the doctrine therefore does not apply. Because Arizona courts have not addressed the common interest doctrine, we look to the Restatement (Third) of Law Governing Lawyers ("Restatement") (2000) for guidance. *See Burns v. Davis,* 196 Ariz. 155, 159, ¶ 5, 993 P.2d 1119, 1123 (App.1999) (absent law to contrary, Arizona follows Restatement with respect to privileges) (citation omitted).

 ¶ 36 Restatement § 76(1) describes the common interest doctrine as follows:

*Aetna Cas. & Sur. Co. v. Certain Underwriters at Lloyd's London,* 176 Misc.2d 605, 676 N.Y.S.2d 727, 730–31, 733 (Sup.Ct.1998) ("[a] private agreement by the parties to protect communications cannot create a privilege") (citation omitted).

11. According to the IRC, it and NDC entered a "Joint Defense Agreement" at the commencement of their relationship in order to memorialize their intent to preserve applicable privileges when communicating about common legal interests. The IRC admits that the Agreement itself cannot create a privilege, and we agree. *See*

If two or more clients with a common interest in a litigated or nonlitigated matter are represented by separate lawyers and they agree to exchange information concerning the matter, a communication of any such client that otherwise qualifies as privileged [as attorney-client communications] that relates to the matter is privileged as against third persons. Any such client may invoke the privilege, unless it has been waived by the client who made the communication.

The doctrine does not create a privilege, but is an exception to the rule that communications between a person and a lawyer representing another person are not privileged. Restatement § 76, Reporters Note cmt. c.

¶ 37 Exchanged communications subject to the common interest doctrine must themselves be privileged as well as related to the parties' common interest, "which may be either legal, factual, or strategic in character." Restatement § 76 cmt. e, Reporters Note cmt. d. Such communications may be made between any member of a "client set"[12] and a member of a similar client set. Restatement § 76 cmt. d. However, communications solely among clients do not fall within the common interest doctrine. *Id.* Finally, the doctrine allows "persons similarly aligned on a matter of common interest" to exchange privileged work product without waiving that privilege. Restatement § 91 cmt. b.

¶ 38 The IRC asserts that the common interest doctrine shields from disclosure communications between it and NDC because the parties had a common legal interest in a non-litigated matter—the redistricting of Arizona in compliance with applicable laws—and each party had legal representation. Following our charge to construe privileges narrowly, *Nixon*, 418 U.S. at 709–10, 94 S.Ct. 3090 we reject this broad view of the common interest doctrine. *See United States v. Weissman*, 195 F.3d 96, 100 (2d Cir.1999) (warning courts should be cautious about extending the attorney-client privilege under the common interest doctrine).

¶ 39 The purpose of the common interest doctrine is to permit persons with common interests to share privileged attorney-client and work-product communications in order to coordinate their respective positions without destroying the privilege. Restatement § 76 cmt. b, § 91 cmt. b. Because the attorney-client privilege only applies to confidential communications made for the purpose of obtaining or providing legal assistance for the client, A.R.S. § 12–2234(B)(2003), it follows that the common interest doctrine protects only those communications made to facilitate the rendition of legal services to *each* of the clients involved in the conference. *See In re Santa Fe Int'l Corp.*, 272 F.3d 705, 712 (5th Cir.2001) (citation omitted); *Duplan v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1175 (D.S.C.1974) (stating common interest doctrine "designed to secure objective freedom of mind for the client in seeking legal advice") (citation omitted). Likewise, the work-product privilege is designed to protect mental impressions and theories of attorneys or other client representatives concerning actual or prospective litigation involving the client. *State ex rel Corbin v. Weaver*, 140 Ariz. 123, 129, 680 P.2d 833, 839 (App.1984). Thus, although a common interest may be "legal, factual, or strategic in character," Restatement § 76 cmt. e, exchanging communications and work product must further the legal interests of each client. *See, e.g., In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 922 (8th Cir.1997) (holding no common interest when First Lady had personal legal interest in criminal investigation, while White House had only political interest, so investigation "can have no legal, factual, or even strategic effect on the White House").

¶ 40 The IRC has failed to demonstrate that any communications or work product exchanged between it and NDC furthered legal interests of both parties. Although the IRC and NDC may share a common goal of drafting a legally viable redistricting plan, they do not share a common *legal* interest, as the IRC contends. The IRC is constitutionally charged with redistricting and it alone is

---

12. A "client set" consists of a client (including a prospective client), the client's agent for communication, the client's lawyer, and the lawyer's agent. Restatement §§ 70, 76 cmt. d.

accountable to the public in performing that task. By contrast, NDC is not legally responsible for redistricting and cannot be held liable to the public for any errors in that process. Rather, NDC has only a contractual obligation to provide specified information and services to the IRC to assist in the redistricting process. Thus, even though the IRC and NDC may share a desire to craft a redistricting plan that complies with all applicable laws, they do not possess a common legal interest. *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d at 922 (shared desire to follow the law insufficient to establish common interest); *see also Shamis v. Ambassador Factors Corp.*, 34 F.Supp.2d 879, 893 (S.D.N.Y.1999) (holding a joint desire to succeed in an action does not create a common interest) (citation omitted); *Walsh v. Northrop Grumman Corp.*, 165 F.R.D. 16, 19 (E.D.N.Y.1996) (finding no common interest when party merely advises other on financial and business strategies even though a mutual concern about possible litigation); *compare United States v. American Tel. & Tel. Co.*, 642 F.2d 1285, 1299 (D.C.Cir.1980) (holding clients who anticipate litigation against common adversary on same issue have common interest).

¶ 41 Therefore, the communications and documents exchanged between the IRC and NDC are not protected by the attorney-client or work-product privileges, as extended by the common interest doctrine.

### D. Waiver

■ ¶ 42 The IRC finally challenges the trial court's ruling that the IRC waived any privileges applicable to communications between its attorneys and the NDC consultants by designating these consultants as testifying expert witnesses. Because the legislative privilege is the only privilege that potentially shields some or all of these communications, given the narrower shield, if any, afforded by the deliberative process privilege, *see supra* ¶¶ 30, 32, 34, we confine our discussion to that privilege.

¶ 43 Both parties acknowledge that resolution of this issue turns on the breadth of this court's decision in *Emergency Care Dynam-ics, Ltd. v. Superior Court*, 188 Ariz. 32, 36–37, 932 P.2d 297, 301–02 (App.1997), which held that a party forgoes work-product protection for communications with a consulting expert, who is also designated as a testifying expert witness, concerning the subject of the expert's testimony. The court's holding was compelled by three factors. First, Arizona has a long-favored practice of allowing full cross-examination of expert witnesses, including inquiry about the expert's sources, relations with the hiring party and counsel, possible bias, and prior opinions. 188 Ariz. at 35, 932 P.2d at 300. Similarly, our courts have allowed expansive pretrial discovery aimed at expert witnesses. *Id.* at 36, 932 P.2d at 301 ("In short . . . Arizona authorities consistently have supported free-ranging, skeptical cross-examination of expert witnesses and open discovery to probe the groundwork for their opinions.") Thus, the court rejected the notion, adopted in some jurisdictions, that only "marginal value" is achieved by permitting a party to explore whether an opposing expert's opinion originated with an attorney and, therefore, the strong policy against disclosure of work product should not be overridden. *Id.* at 34–35, 932 P.2d at 299–300.

¶ 44 Second, Arizona Rules of Civil Procedure ("ARCP") 26(b)(4), governing discovery of experts, supported the court's decision. *Id.* at 36, 932 P.2d at 301. Specifically, before adoption of Rule 26(b)(4), the supreme court had allowed parties to discover an opposing expert's groundwork and opinions. *Id.* (citing *State ex rel. Willey v. Whitman*, 91 Ariz. 120, 124, 370 P.2d 273, 277 (1962)). Because Rule 26(b)(4) was intended to maintain then-existing discovery practices, the court concluded that the rule favored wide-open discovery of experts. *Id.* (citing State Bar Committee Note to 1970 Amendment of ARCP 26(b)(4)). Indeed, Rule 26(b)(4) differentiated between consulting experts and testifying experts by imposing a "substantial barrier" against discovery from consulting experts, while extending greater authority to the court to order discovery from a testimonial expert.[13] *Id.* at 34, 36, 932 P.2d at 299, 301.

---

13. At the time the court decided *Emergency Care*, Rule 26(b)(4)(A)(ii) authorized the court, upon

¶ 45 Third, and finally, the court explained that a "bright-line" rule for discovery aimed at experts employed jointly as consultants and testifying experts was preferable to engaging in expensive and time-consuming discovery disputes to determine which role the expert was playing when he or she reviewed a particular document. *Id.* at 37, 932 P.2d at 302. Thus, "[a]n expert may be either a witness or a protected consultant, but not both." *Id.* at 36, 932 P.2d at 301.

¶ 46 The IRC contends that *Emergency Care* applies only to waiver of the work-product privilege, and has no application to the legislative privilege. The Coalition responds that the designation of a consultant as a testifying expert waives any legislative privilege attaching to materials considered by that expert in forming his or her opinions. We agree with the Coalition.

¶ 47 Although *Emergency Care* dealt only with waiver of the work-product privilege, the sole issue before it, the court's reasoning is equally applicable to waiver of the legislative privilege. 188 Ariz. at 32, 932 P.2d at 297. We disagree with the IRC that the goal of allowing full and fair cross-examination of expert witnesses would not be thwarted by shielding privileged communications involving such witnesses and concerning their expert topic that occurred before initiation of a lawsuit. Such communications reflect the relations between expert, hiring client and counsel, which may reveal bias. Additionally, these communications may reveal an expert's sources and prior opinions on the subject of his or her testimony—all fodder for "free-ranging, skeptical cross-examination" of that expert. *Emergency Care*, 188 Ariz. at 35–36, 932 P.2d at 300–01. In short, extending the *Emergency Care* holding to any legislative privilege shielding communications with a consulting/testifying expert prior to initiation of a lawsuit, and relating to the subject of the expert's testimony, simply acknowledges the reality that the expert's

groundwork for that opinion started before the opposing party filed a complaint.

¶ 48 We also disagree with the IRC that the reasoning in *Emergency Care* is inapplicable because the legislative privilege has constitutional origins. The holder of a legislative privilege can waive the privilege on his or her own behalf or for aides. *Gravel*, 408 U.S. at 622, n. 13, 92 S.Ct. 2614; *Marylanders For Fair Representation*, 144 F.R.D. at 298. Thus, just as an IRC commissioner can waive the privilege concerning a subject by electing to testify about it, the commissioner can waive the privilege attaching to communications about that subject with a consultant by designating that consultant as a testifying expert. *Compare United States v. Nobles*, 422 U.S. 225, 239–240, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) (holding criminal defendant's election to present investigator as witness waived work-product privilege regarding subject of testimony, and noting defendant "can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination").

¶ 49 Finally, like the attorneys in *Emergency Care*, the IRC and its attorneys exclusively control the selection of its testifying experts. Thus, the IRC can avoid waiving any legislative privilege by simply selecting testifying experts who did not also serve as pre-litigation consultants. Although such a practice may be expensive, the costs "are likely cumulatively to be lesser than the systemic costs of innumerable discovery battles over expert witness files." *Emergency Care*, 188 Ariz. at 37, 932 P.2d at 302.

¶ 50 In summary, we hold that by designating consulting experts as testifying experts, the IRC waived any legislative privilege (1) attaching to communications with

motion, to order discovery against experts by means other than interrogatories "subject to such restrictions as to scope ... as the court may deem appropriate." *Emergency Care,* 188 Ariz. at 34, 932 P.2d at 299. In 1997, this provision was removed and replaced with the following: "A party may depose any person who has been

identified as an expert whose opinions may be presented at trial." ARCP 26(b)(4)(A) (1987 and Supp.1997). Consequently, since *Emergency Care,* parties have been given even greater access to testifying experts during pretrial discovery, thereby strengthening the *Emergency Care* court's holding.

those experts, or any materials reviewed by them, *and* (2) relating to the subject of the expert's testimony.[14] Any legislative privilege shielding communications with such experts, or any materials reviewed by them, that do not relate to the particular subject of the expert's testimony, remain privileged.

### RELIEF GRANTED

¶ 51 We vacate that portion of the trial court's order dated March 21, 2003 compelling the IRC to produce documents exchanged with NDC consultants that are both protected by the legislative privilege and have not been waived by the IRC's designation of these consultants as testifying experts. We direct the IRC to immediately identify those documents listed on its privilege log that fit this criteria. The IRC shall immediately produce to the Coalition all remaining documents listed in the privilege log. Thereafter, and without undue delay, the IRC shall submit any documents it deems privileged and not waived to the trial court for an *in camera* inspection. The court shall then decide whether these documents are shielded by the legislative privilege.

¶ 52 The IRC asks us to award it attorneys' fees pursuant to A.R.S. §§ 12–349(A), –350 (2003). The Coalition seeks a fee award pursuant to ARCP 37(a)(4) and Arizona Rule of Procedure for Special Action § 4(g). In our discretion, we deny both requests.

¶ 53 Finally, upon the filing of this opinion, we vacate our prior stay order.

SNOW and WEISBERG, JJ., concurring.

14. No one contends that the IRC did not act on behalf of the individual commissioners when it designated the consulting experts as testifying experts. Thus, we do not address whether the IRC, as a body, could waive any legislative privilege held by a commissioner.