IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

JAVAN "J.D." MESNARD AND HOLLY MESNARD,
**HUSBAND AND WIFE,**
*Petitioners,*

*v.*

HON. THEODORE CAMPAGNOLO, JUDGE OF THE SUPERIOR
COURT OF THE STATE OF ARIZONA,
**IN AND FOR THE COUNTY OF MARICOPA,**
*Respondent Judge,*

DONALD M. SHOOTER,
*Real Party in Interest.*

No. CV-20-0209-PR
**June 30, 2021**

Appeal from the Superior Court in Maricopa County
The Honorable Theodore Campagnolo, Judge
No.   CV2019-050782
**AFFIRMED IN PART, REVERSED IN PART, AND
REMANDED**

Order of the Court of Appeals
Division One
No.   1 CA-SA 20-0125
Filed July 13, 2020

COUNSEL:

Stephen W. Tully (argued), Bradley L. Dunn, Hinshaw & Culbertson LLP,
Phoenix, Attorneys for Javan "J.D." Mesnard and Holly Mesnard

Philip A. Byler (argued), Andrew T. Miltenberg, Stuart Bernstein, Nesenoff
& Miltenberg, LLP, New York, NY; Thomas C. Horne, Horne Slaton, PLLC,
Scottsdale, Attorneys for Donald M. Shooter

Andrew G. Pappas, Arizona House of Representatives, Phoenix, Attorneys for Amicus Curiae Russell Bowers, Speaker of the Arizona House of Representatives

Ronald Jay Cohen, Daniel P. Quigley, Betsy J. Lamm, Lauren M. LaPrade, Cohen Dowd Quigley P.C., Phoenix, Attorneys for Amicus Curiae Kirk and Janae Adams

---

VICE CHIEF JUSTICE TIMMER authored the opinion of the Court, in which CHIEF JUSTICE BRUTINEL and JUSTICES LOPEZ and MONTGOMERY joined. JUSTICE BOLICK issued an opinion concurring in the result.[*]

---

VICE CHIEF JUSTICE TIMMER, opinion of the Court:

¶1 The Arizona House of Representatives expelled Representative Donald M. Shooter as an elected representative. He sued Javan "J.D." Mesnard, the Speaker of the House during the expulsion proceeding, for defaming him in an investigatory report and a news release. The issue here is whether the trial court correctly denied Mesnard's motion to dismiss under the legislative immunity doctrine. We hold that Mesnard is immune as a matter of law for allegedly defaming Shooter in the investigatory report. We further hold that on this record, Mesnard is not immune for allegedly defaming Shooter in the news release.

## BACKGROUND

¶2 In reciting the backdrop to the issues here, we "assume the truth of all well-pleaded factual allegations" in the amended complaint and "indulge all reasonable inferences from those facts." *Coleman v. City of Mesa*, 230 Ariz. 352, 356 ¶ 9 (2012). We also draw from relevant exhibits to the amended complaint and the public records relied on by the parties in

---

[*] Justice James P. Beene has recused himself from this matter. Before his retirement from the Court, Justice Andrew W. Gould (Ret.) also recused himself from this matter.

the motion-to-dismiss proceedings. *See id.* Although the eighty-five-page amended complaint makes multiple factual allegations, we focus only on those pertinent to resolving the issues here.

**¶3** Mesnard, Shooter, and Michelle Ugenti-Rita served together as elected representatives in the Arizona House of Representatives. In 2017, while Mesnard was Speaker of the House, Ugenti-Rita publicly accused Shooter of sexual harassment. Mesnard purportedly pressured Shooter to resign his office, but he refused to do so. Shooter vehemently denied any wrongdoing and asked Mesnard to investigate the allegations against him along with reports that Ugenti-Rita had herself engaged in malfeasance and sexual misconduct.

**¶4** Rather than referring the matter to the House Ethics Committee, Mesnard appointed his staff members to a "special investigation team" to investigate the original allegations concerning Shooter and Ugenti-Rita and other misconduct allegations that had emerged involving them and one other representative. At Mesnard's direction, the team hired the law firm of Sherman & Howard to independently determine whether Shooter or Ugenti-Rita had violated Mesnard's newly created "zero-tolerance" workplace harassment policy that was not formally adopted by the House as a rule until after the investigation had concluded.

**¶5** Sherman & Howard authored a lengthy investigation report and provided a draft to Mesnard in mid-January 2018. According to Shooter, Mesnard "changed the report to remove exculpatory information about Shooter" and excluded "evidence of sexual misconduct by Ugenti-Rita" before releasing the final report at the end of January to House members and the general public. The final report concluded that although most allegations against Shooter were unsupported, credible evidence demonstrated he had violated the zero-tolerance policy. The report further stated that no credible evidence demonstrated Ugenti-Rita had violated the policy. No mention was made of the third representative under investigation.

**¶6** Soon after the report's release, Shooter learned that a legislative aide had been "deeply hurt" by the report's omission of evidence she had provided concerning misconduct by Ugenti-Rita. The aide conveyed she had "lost faith in the process," and her "worst fears had been realized" as she now feared retaliation from Ugenti-Rita. This prompted

Shooter to send a letter to all House members on February 1 criticizing the report for omitting the aide's evidence, although he did not identify the aide or Ugenti-Rita by name. The record does not reflect whether Shooter also released this letter to the public.

¶7 Mesnard reacted to Shooter's letter that same day by issuing a statement through this news release:

> STATE CAPITOL, PHOENIX—Speaker of the House J.D. Mesnard (R-17) today released the following statement regarding Representative Shooter's continuation and escalation of his improper conduct, even after Speaker Mesnard's warning:
>
> "The outside investigators, who Rep. Shooter praised on Tuesday, have thoroughly examined every allegation made, including the allegation referenced in Rep. Shooter's letter. After addressing issues of privacy and relevancy, they included their findings in the report."
>
> "I've spoken with the individual referenced by Rep. Shooter, and the individual has stated that the letter does not reflect the individual's reaction to the report. Rep. Shooter's letter is nothing more than an effort to use the individual as a pawn—despite repeated requests from the individual's attorney that Rep. Shooter not do anything to jeopardize the individual's anonymity. He's not standing up for the victim but rather is further victimizing the individual."
>
> "Rep. Shooter's letter represents a clear act of retaliation and intimidation, and yet another violation of the House's harassment policy, so I will be moving to expel him from the House of Representatives immediately."

As promised in the news release, Mesnard introduced a bill that day to expel Shooter from the House, which passed overwhelmingly. Mesnard introduced the bill in his capacity as a representative and not as speaker.

¶8 Shooter initiated this lawsuit seeking damages and other relief against Mesnard and other defendants. Relevant here, Shooter alleged multiple causes of action against Mesnard and his wife, including

defamation and conspiracy to commit defamation. The defamation claims were based on Mesnard allegedly (1) materially altering the Sherman & Howard report and releasing it to House members and the public and (2) making untrue and defamatory statements about Shooter in the news release.

**¶9** Mesnard and the other defendants filed motions to dismiss the amended complaint for failing to state cognizable claims pursuant to Arizona Rule of Civil Procedure 12(b)(6). The trial court granted all motions in part and denied them in part. Pertinent here, the court rejected Mesnard's arguments that his elected office rendered him absolutely immune from any liability for the defamation claims. The court reasoned it could not decide whether absolute legislative immunity applied to those claims "without a well-developed record." It therefore ruled that Shooter had stated viable claims against Mesnard for defamation and conspiracy to commit defamation.

**¶10** Mesnard unsuccessfully sought special action relief from the court of appeals. We granted review to address the scope of absolute legislative immunity under Arizona law, an issue of statewide importance. We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

## DISCUSSION

### I. General Principles

**¶11** We review a trial court's denial of a motion to dismiss de novo. *Coleman*, 230 Ariz. at 355 ¶ 7. Dismissal is appropriate only if a plaintiff "would not be entitled to relief under any interpretation of the facts susceptible of proof" as a matter of law. *Id.* at 356 ¶ 8 (quoting *Fid. Sec. Life Ins. Co. v. State Dep't of Ins.*, 191 Ariz. 222, 224 ¶ 4 (1998)).

**¶12** Absolute legislative immunity is rooted in common law and embodied in both the United States and the Arizona Constitutions and the principles underlying separation of governmental powers. *See Ariz. Ind. Redistricting Comm'n (AIRC) v. Fields*, 206 Ariz. 130, 136 ¶ 15 (App. 2003); U.S. Const. art. I, § 6, cl. 1 ("[F]or any Speech or Debate in either House, [senators and representatives] shall not be questioned in any other Place."); Ariz. Const. art. 4, pt. 2, § 7 ("No member of the Legislature shall be liable in any civil or criminal prosecution for words spoken in debate."). When

applicable, the doctrine prevents legislators, their aides, and their contractors from being criminally prosecuted or held civilly liable for their legislative activities. *AIRC*, 206 Ariz. at 136 ¶ 15, 140 ¶ 30. Immunity does not exist for legislators' personal benefit but instead "support[s] the rights of the people, by enabling their representatives to execute the functions of their office without fear of prosecutions, civil or criminal." *Id.* at 137 ¶ 17 (quoting *Coffin v. Coffin*, 4 Mass. 1, 27 (1808)); *see also United States v. Brewster*, 408 U.S. 501, 507 (1972) (emphasizing that immunity "protect[s] the integrity of the legislative process by insuring the independence of individual legislators"); *Gravel v. United States*, 408 U.S. 606, 617 (1972) (describing the Speech or Debate Clause's "central role" as "prevent[ing] intimidation of legislators by the Executive and accountability before a possibly hostile judiciary"). Whether legislative immunity applies is a legal question for the court. *See Green Acres Trust v. London*, 141 Ariz. 609, 613 (1984).

**¶13** Arizona has adopted Restatement of Torts (Second) § 590 (Am. Law Inst. 1977), which is grounded on the federal Speech or Debate Clause and like state constitutional provisions. *See Sanchez v. Coxon*, 175 Ariz. 93, 97 (1993); Restatement § 590 cmt. a. Section 590 provides that federal, state, and local legislators are "absolutely privileged to publish defamatory matter concerning another in the performance of [their] legislative functions." The key inquiry is whether the legislator was performing a "legislative function" at the time he published the defamatory matter. *See Gravel*, 408 U.S. at 624 (stating that a congressional member's conduct taken "within the 'sphere of legitimate legislative activity'" is immune from "civil or criminal judgment" (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951))); *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975) (concluding that legislators may neither be sued nor made to testify about their words or conduct when acting in their legislative capacity); *see also Sanchez*, 175 Ariz. at 97 ("It is the occasion of the speech, not the content, that provides the privilege.").

**¶14** Not everything done by a legislator "in any way related to the legislative process" is afforded absolute immunity as a legislative function. *See Steiger v. Superior Court*, 112 Ariz. 1, 4 (1975) (discussing the evidentiary privilege stemming from legislative immunity); *see also Brewster*, 408 U.S. at 516 (reasoning the Speech or Debate Clause was never intended to make congressional members "super-citizens," immune from responsibility). Legislators are unquestionably immune from criminal responsibility and civil liability when engaging in speech or debate during convened

legislative proceedings. *See Sanchez*, 175 Ariz. at 97 (holding that council member was engaged in a legislative function when speaking at a town council meeting and thus immune from civil liability for any defamatory remarks). But immunity has never been limited to such occasions. *See Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880) ("It would be a narrow view of the constitutional provision to limit it to words spoken in debate.").

¶15 Other than speech and debate during a legislative session, immunity applies to acts that are "an integral part of the deliberative and communicative processes" by which legislators participate in committee and chamber proceedings "with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel*, 408 U.S. at 625; *see also Brewster*, 408 U.S. at 512 ("[T]he Speech or Debate Clause prohibits inquiry only into those things generally said or done in the House or the Senate in the performance of official duties and into the motivation for those acts."); *Steiger*, 112 Ariz. at 3 (to same effect). Alternately phrased, "the courts have extended the privilege to matters beyond pure speech or debate in either House, but 'only when necessary to prevent indirect impairment of such deliberations.'" *Gravel*, 408 U.S. at 625 (quoting *United States v. Doe*, 455 F.2d 753, 760 (1972), *vacated sub nom. Gravel*, 408 U.S. 606). Thus, legislative immunity applies to written reports, offered resolutions, voting, and other "things generally done in a session of the House by one of its members in relation to the business before it." *Kilbourn*, 103 U.S. at 204.

¶16 Legislative immunity is consequently inapplicable to many legitimate and beneficial acts undertaken by legislators. Making speeches outside the legislative body, performing tasks for constituents, sending newsletters, issuing news releases, and the like are political acts, which are unprotected by legislative immunity. *See Brewster*, 408 U.S. at 512; Restatement § 590 cmt. a ("The privilege does not protect a legislator who in private or public discussion outside of his legislative function explains his reasons for voting on past, pending or proposed legislation or who otherwise discusses the legislation, or who engages in other activities incidentally related to legislative affairs but not a part of the legislative process itself."). Administrative matters undertaken by legislators, such as exhorting an executive branch agency to administer a law in a particular way, are similarly unprotected. *See Gravel*, 408 U.S. at 625; *AIRC*, 206 Ariz. at 137 ¶ 18.

## II. Application Here

### A. The Sherman & Howard Report

**¶17** Whether Mesnard is absolutely immune from liability for allegedly defaming Shooter by modifying the draft Sherman & Howard report to Shooter's detriment and then releasing it to House members and the public depends entirely on whether preparation and release of the report was a legislative function. *See Gravel*, 408 U.S. at 624; Restatement § 590.

**¶18** Shooter argues that because Mesnard's modifications were surreptitious and dishonest, he did not engage in a legislative function. But whether Mesnard acted with ill motives or actually defamed Shooter has no bearing on whether Mesnard was performing a legislative function to which legislative immunity attaches. *See United States v. Johnson*, 383 U.S. 169, 180 (1966) (emphasizing that whether a representative gave a speech on the House floor in return for private remuneration involved an inquiry into his motives for a legislative function, which "is precisely what the Speech or Debate Clause generally forecloses from executive and judicial inquiry"); *Sanchez*, 175 Ariz. at 97 ("When Councilman Sanchez made the [allegedly defamatory] statements, he was a legislator speaking to a legislative body during a formal legislative meeting—clearly a legislative function."); *see also Green Acres Trust*, 141 Ariz. at 613 (stating in the context of judicial absolute immunity that "the speaker's motive, purpose or reasonableness in uttering a false statement do not affect the defense"). In other words, we examine the act, not the actor. *See Walker v. Jones*, 733 F.2d 923, 929 (D.C. Cir. 1984).

**¶19** The Arizona Constitution authorizes each legislative chamber to discipline its members and even expel a member "with the concurrence of two-thirds of its members." *See* Ariz. Const. art. 4, pt. 2, § 11. Investigating the basis for discipline or expulsion is inherent in this authority because the investigatory results inform the decision whether to impose discipline on members or expel them from the chamber. *Cf. Eastland*, 421 U.S. at 504 (noting "the power to investigate" is necessary to enable wise decisions, making it "inherent in the power to make laws," and is therefore plainly protected by legislative immunity); *Rangel v. Boehner*, 785 F.3d 19, 23 (D.C. Cir. 2015) (concluding that a congressional disciplinary proceeding is a "legislative matter" that the Constitution places within the

House's jurisdiction (quoting *Gravel*, 408 U.S. at 625) (internal quotation marks omitted)); *Gamrat v. Allard*, 320 F. Supp. 3d 927, 936 (W.D. Mich. 2018) (holding that actions associated with the investigation and expulsion of a member of a state House of Representatives are legislative in nature and privileged).

¶20        Here, the House, through Mesnard acting as speaker, retained Sherman & Howard to investigate misconduct allegations against three House members, including Shooter.   The investigation did not lose its character as a legislative function simply because an outside investigator conducted it.   *See Doe v. McMillan*, 412 U.S. 306, 312 (1973) (extending legislative immunity to a consultant); *AIRC*, 206 Ariz. at 140 ¶¶ 29–30 (acknowledging that "the modern, part-time legislature, in light of budgetary constraints, contracts with expert consultants on a variety of subjects rather than retaining staff with such expertise" and extending the legislative privilege to such contractors' acts "that would be privileged legislative conduct if personally performed by the legislator").

¶21        The resulting investigative report, even if modified by Mesnard, was "an integral part of the deliberative and communicative processes" respecting House members' decisions whether to vote for Shooter's expulsion—a matter firmly within the House's jurisdiction.   *See Gravel*, 408 U.S. at 625; *see also Hutchinson v. Proxmire*, 443 U.S. 111, 133 (1979) (acknowledging that preparation of committee reports is protected by legislative immunity).   Preparation of the report and its release to House members was therefore a legislative function protected by absolute legislative immunity.   *See McMillan*, 412 U.S. at 313 (holding that preparing an investigative report and "authorizing the publication and distribution of that report" were "integral part(s) of the deliberative and communicative process by which Members participate in committee and House proceedings with respect to . . . matters which the Constitution places within the jurisdiction of either House" (quoting *Gravel*, 408 U.S. at 625)).

¶22        Mesnard's act in releasing the report to the public was also a legislative function protected by legislative immunity.   Arizona law requires public records in the custody of elected officials to be "open to inspection by any person."   A.R.S. §§ 39-121, -121.01.   As an elected representative who ordered the investigation, participated in drafting the report, and had custody of it, Mesnard was authorized to permit public inspection of the report and thus performed a legislative function in doing

so.   The situation here is distinguishable from the one in *Gravel*, where the Supreme Court held that a senator who lacked authority to arrange for private publication of classified materials introduced at a congressional subcommittee hearing was not shielded by the Speech or Debate Clause. 408 U.S. at 625–26.

**¶23**      The record does not show whether a member of the public asked to inspect the report before Mesnard released it.   *See* § 39-121.01(D) (outlining request process).   But even absent such a request, and given his authority, Mesnard performed a legislative function by releasing the report. *See McMillan*, 412 U.S. at 314 ("Members of Congress are themselves immune for ordering or voting for a publication going beyond the reasonable requirements of the legislative function."); *Hutchinson*, 443 U.S. at 130, 133 (reaffirming that congressional members cannot be held liable for voting to publish a committee report and distinguishing private republication of such reports); *Green v. DeCamp*, 612 F.2d 368, 372 (8th Cir. 1980) (holding that state senators' release of committee's investigative report "to news reporting and publishing agencies" was a legitimate legislative activity, making the senators immune from suit); *Romero-Barcelo v. Hernandez-Agosto*, 75 F.3d 23, 31 (1st Cir. 1996) (concluding that decision to "publish" content of legislative hearings through live telecasts "constituted legislative conduct absolutely immune from civil suit").

**¶24**      Shooter also argues that Mesnard's retention of a law firm to investigate the allegations against Shooter and then create a report rather than assigning a House committee to investigate and then conduct public hearings denied Shooter due process and was outside the "sphere of legislative activity," making release of the resulting report unprotected by legislative immunity.   The sole authorities cited for this argument are cases emphasizing Arizona's reluctance to immunize public servants from liability.   *See, e.g.*, *Sanchez*, 175 Ariz. at 97 ("We do not favor immunity from common law liability.").

**¶25**      We are unpersuaded.   Whether Mesnard violated House rules, statutory law, or even the state or federal Constitution has no bearing on whether his actions were legislative functions and thus afforded immunity.   *See Kilbourn*, 103 U.S. at 203–04 (acknowledging that immunity applies to legislative functions "without inquiring whether the exercise was regular, according to the rules of the House, or irregular and against their rules" (quoting *Coffin*, 4 Mass. at 27)); *McMillan*, 412 U.S. at 312–13 (noting legislative immunity applies to acts taken within the "legislative sphere"

even if in other contexts the action would be "unconstitutional or otherwise contrary to criminal or civil statutes"); *Eastland*, 421 U.S. at 509–10 (same); *Rangel*, 785 F.3d at 24 ("An act does not lose its legislative character simply because a plaintiff alleges that it violated the House Rules or even the Constitution . . . ." (citation omitted)). Such sweeping protection "has enabled reckless men to slander and even destroy others with impunity, but that was the conscious choice of the Framers." *Brewster*, 408 U.S. at 516 & n.11 ("The injury to the reputation of a private citizen is of less importance to the commonwealth, than the free and unreserved exercise of the duties of a representative, unawed by the fear of legal prosecutions." (quoting *Coffin*, 4 Mass. at 28)). Any remedy for such abuses must come from the voters, not the courts. *See Tenney*, 341 U.S. at 378 ("In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses.").

**¶26** In sum, Mesnard performed a legislative function when he modified the draft Sherman & Howard report and then released it to House members and the general public. He is therefore absolutely immune from liability to Shooter based on these actions.

**¶27** We briefly address Justice Bolick's separate concurrence, which raises an unargued issue and then incorrectly resolves it. He asserts that Shooter's defamation claims involving the Sherman & Howard report are nonjusticiable political questions because our constitution tasks the legislature alone with disciplining or expelling a member. *See infra* ¶ 40; *see also Forty-Seventh Legislature of State v. Napolitano*, 213 Ariz. 482, 485 ¶ 7 (2006) ("'Political questions,' broadly defined, involve decisions that the constitution commits to one of the political branches of government and raise issues not susceptible to judicial resolution according to discoverable and manageable standards."). But the defamation claims do not challenge the House's decisions to investigate Shooter or expel him. Instead, they focus on an individual legislator's publication of allegedly defamatory statements contained within the investigative report. Adjudication of such claims, including an immunity defense, is a matter constitutionally committed to the judicial branch, not the legislative branch, and is therefore justiciable. *See* Ariz. Const. art. 6, § 1.

### B. The News Release

**¶28** Whether Mesnard is absolutely immune from liability for issuing a defamatory news release also depends on whether doing so was a legislative function. *See Gravel*, 408 U.S. at 624; Restatement § 590. As previously explained, *see supra* ¶ 16, a legislator who issues a news release does not perform a legislative function but instead engages in a political act. Mesnard nevertheless argues that issuing the news release here was a legislative function because the release explained the basis for his decision to seek Shooter's expulsion, the release was issued during the legislative session, and he was acting as the speaker.

**¶29** Putting aside, for now, Mesnard's role as speaker, he did not perform a legislative function by issuing the news release because informing the public about his decision to seek Shooter's expulsion was not "an integral part of the deliberative and communicative processes" concerning the House investigation or any contemplated disciplinary action against Shooter. *See Gravel*, 408 U.S. at 625; *see also Steiger*, 112 Ariz. at 3. Mesnard's explanation to his colleagues on the House floor later that day, which repeated and expanded on the thrust of the news release, served that purpose and was immune as a legislative function. *See id.*

**¶30** The Supreme Court's opinion in *Hutchinson v. Proxmire*, 443 U.S. 111, is instructive. The issue there was whether Senator Proxmire was absolutely immune for publishing allegedly defamatory statements about the plaintiff in news releases and newsletters highlighting what the senator perceived to be wasteful government spending. *Id.* at 113–14. The senator argued that issuing those documents was a protected legislative function because they communicated legislative positions to other senators in a focused manner and informed constituents of issues under consideration. *Id.* at 130–32. The Court rejected both arguments, reasoning that, at best, such missives only related to the legislative process but were not essential to it. *See id.* at 131–33 ("Valuable and desirable as it may be in broad terms, the transmittal of such information by individual Members in order to inform the public and other Members is not a part of the legislative function or the deliberations that make up the legislative process.").

**¶31** Like the news releases in *Hutchinson*, the release here was not essential to the legislative process and thus fell outside the reach of legislative immunity. *See id.* at 133 (describing news releases and

newsletters as means of primarily informing people "outside the legislative forum" and thus not subject to immunity); *see also Brewster*, 408 U.S. at 514 ("[O]nly acts generally done in the course of the process of enacting legislation were protected."). It makes no difference that the subject of the release addressed a matter coming before the House. *Cf. United States v. Helstoski*, 442 U.S. 477, 489 (1979) ("Promises by a Member to perform an act in the future are not legislative acts."). The key consideration is whether issuing the news release was essential to members' deliberation or communication about the investigation or its ramifications. *See Gravel*, 408 U.S. at 625; *Steiger*, 112 Ariz. at 3. It was not.

**¶32** Mesnard urges us to follow two out-of-state court cases decided before *Hutchinson*. *See State ex rel. Okla. Bar Ass'n v. Nix*, 295 P.2d 286, 291–93 (Okla. 1956) (holding that a legislator was immune for issuing an in-session press release that referred to the legislator's speech on the floor); *Abercrombie v. McClung*, 525 P.2d 594, 600–01 (Haw. 1974) (concluding that a legislator was immune for a statement to the press that clarified a speech delivered on the floor). These decisions are unpersuasive because they based immunity on the close relationship between the challenged actions and legitimate legislative functions. *See Nix*, 295 P.2d at 288 (press release issued in conjunction with floor speech); *Abercrombie*, 525 P.2d at 600 (clarifying floor speech). They did not focus, as we do, on whether the challenged actions were integral parts of the deliberative and communicative processes engaged in by members regarding a matter before them. *See Gravel*, 403 U.S. at 625.

**¶33** Mesnard's role as speaker does not require a different result. Mesnard and amici stress he was the speaker at the time he issued the news release. But they provide no evidence that the House authorized Mesnard to speak on its behalf or that, apart from identifying himself as speaker, Mesnard was acting in that capacity when he issued the news release. Our review of the constitution, statutes, House procedural rules, and caselaw does not reveal such authority. And even assuming the speaker performs a legislative function when authorized to issue a news release on the House's behalf, an issue we do not decide today, we cannot conclude as a matter of law that Mesnard exercised that authority here because the release communicates only his personal views and plans rather than those of the House.

**¶34** At oral argument, Mesnard asserted he issued the news release as an exercise of the speaker's inherent authority, relying on *Barr v. Matteo*, 360 U.S. 564 (1959). There, former employees of the Office of Rent Stabilization sued that agency's acting director for issuing an allegedly libelous news release announcing his decision to fire them for authorizing a publicly controversial employee-leave reimbursement plan. *Id.* at 565–68. The Supreme Court held that although "[t]he question is a close one," the acting director was absolutely immune from liability under the common law doctrine of official immunity. *Id.* at 574. It noted that "[t]he integrity of the internal operations of the agency" as evidenced by "charges made on the floor of the Senate and given wide publicity" had been challenged. *Id.* at 574. Under these circumstances, the acting director was necessarily bestowed with authority to issue the release "if the public service is to function effectively." *Id.* at 574–75. "It would be an unduly restrictive view of the scope of the duties of a policy-making executive official to hold that a public statement of agency policy in respect to matters of wide public interest and concerns is not action in the line of duty." *Id.* at 575.

**¶35** *Barr* does not persuade us that Mesnard is absolutely immune as a matter of law. This Court has previously rejected *Barr*'s applicability to Arizona's common law official immunity doctrine. *See Chamberlain v. Mathis*, 151 Ariz. 551, 558–60 (1986) (adopting a general rule of qualified immunity for executive officials and stating that absolute immunity applies only when essential to conducting public business); *see also Goddard v. Fields*, 214 Ariz. 175, 178 ¶ 10 (App. 2007) (concluding the attorney general does not have absolute immunity for issuing allegedly defamatory news release that informed the public of pending litigation). But even assuming the speaker had inherent authority to issue a news release announcing House action taken to restore public trust in the chamber, akin to the situation in *Barr*, the record here does not establish such circumstances. Nothing suggests that Shooter's letter had been released to the public or that public trust in the House's internal operations was at risk; the letter and news release were issued the same day. And the release did not announce House action or purport to reflect any members' views other than Mesnard's.

**¶36** In sum, issuing news releases is not generally a legislative function protected by legislative immunity. *See Brewster*, 408 U.S. at 512; *Hutchinson*, 443 U.S. at 131–33; *AIRC*, 206 Ariz. at 137 ¶ 18. The record does not establish as a matter of law that issuing the release here was

14

integral to the House members' deliberative or communicative processes regarding a pending matter. *See Gravel*, 408 U.S. at 625.

## CONCLUSION

**¶37**      For the foregoing reasons, we affirm the trial court's denial of Mesnard's motion to dismiss as it concerns his issuance of the news release. We reverse its ruling denying the motion as it concerns Mesnard's alleged modification and release of the Sherman & Howard report.      We remand to the trial court with directions to dismiss the defamation claims regarding the report and to proceed with the claims regarding the news release, subject to any evidence that Mesnard was authorized to issue the release as speaker and that exercising such authority constituted a legislative function subject to absolute immunity.

BOLICK, J., concurring in the result:

**¶38** I agree with the outcome my colleagues have reached but take a different route to that destination.

**¶39** The Court devotes the bulk of its analysis to the question of whether the challenged actions are a legislative function. But that begs the question of what exactly the function is. All the actions here were integral parts of punishing or expelling a member. And the Constitution expressly invests that function solely in the legislature. It is therefore a nonjusticiable political question.

**¶40** Our Constitution so greatly values separation of powers that it devotes an entire article to it, commanding: "The powers of the government of the state of Arizona shall be divided into three separate departments, the legislative, the executive, and the judicial; and, except as provided in this constitution, such departments shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others." Ariz. Const. art. 3. Thus, "before we reach the merits of [a constitutional] claim, we must decide whether it is 'justiciable,' that is, whether it is a claim that may be resolved by the courts." *Nixon v. United States*, 506 U.S. 224, 226 (1993). Although it is the power of the courts to declare "what the law is," *Marbury v. Madison*, 5 U.S. 137, 177 (1803), sometimes "the law is that the judicial department has no business entertaining the claim of unlawfulness—because the question is entrusted to one of the political branches . . . ." *Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004); *see also Forty-Seventh Legislature v. Napolitano*, 213 Ariz. 482, 485 ¶ 7 (2006).[1]

---

[1] The courts have defined a second type of nonjusticiable political question as "issues not susceptible to judicial resolution according to discoverable and manageable standards." *Napolitano*, 213 Ariz. at 485 ¶ 7. Although judicial avoidance of matters entrusted to the legislative or executive branches is a separation of powers maxim, I have observed elsewhere that the second type of political question, "as a standalone doctrine . . . abdicat[es] the judiciary's central role of constitutional interpretation." *State v. Maestas*, 244 Ariz. 9, 15 ¶ 27 (2018) (Bolick, J., concurring).

**¶41** The "courts possess power to review either legislative or executive action that transgresses identifiable textual limits," *Nixon*, 506 U.S. at 238, but not where the Constitution places specific authority exclusively within the power of a political branch. Thus, in *Nixon*, the Court held that the Constitution vested sole authority in the Senate to choose impeachment procedures; whereas in *Powell v. McCormack*, the question of whether the U.S. House of Representatives could expel a member under its constitutional power to judge the qualifications of its members was justiciable because the Constitution separately defined those qualifications. 395 U.S. 486, 548 (1969).

**¶42** Article 4, part 2, section 11 of the Arizona Constitution provides: "Each house may punish its members for disorderly behavior, and may, with the concurrence of two-thirds of its members, expel any member." Ariz. Const. art. 4, pt. 2, § 11. This textual commitment of authority to a political branch is about as clear as constitutional language gets, and no relevant additional constitutional constraints exist to empower us to inquire further into the legislature's decision making or processes. Therefore, it is beyond the judicial power to second-guess the legislature's methods and actions. The remedy for abuse of such constitutionally assigned powers is political, not legal.

**¶43** The analysis here largely parallels my colleagues' approach under the Speech and Debate Clause, Ariz. Const. art. 4, pt. 2, § 7: the legislature's actions in "[i]nvestigating the basis for discipline or expulsion is inherent in [the constitutional power] because the investigatory results inform the decision whether to impose discipline on members or expel them from the chamber." *Supra* ¶ 19. This is precisely the power invested in the legislature by article 4, part 2, section 11, making it a nonjusticiable political question. Thus, the Sherman & Howard report, along with its alleged adulteration, are not matters for the judiciary to adjudicate. Mesnard's news release, by contrast, does not appear to be part of that process, so I agree with my colleagues that, based on the existing record, it may be actionable.

**¶44** I believe the case should be resolved on political question rather than on speech or debate grounds for three reasons. First, justiciability is a threshold question that should be determined before the Court proceeds to the merits. *See Nixon*, 506 U.S. at 226. Second, as my colleagues acknowledge, *supra* ¶¶ 13–15, the reach of the Speech and Debate Clause

has been greatly expanded beyond speech and debate.[2]   I am troubled by the judicial expansion of legislative immunity—or immunity of any public officials, for that matter—beyond that which is expressly constitutionally provided.   Third, and relatedly, as the Court's decision illustrates, the contours of that immunity are not easily determined.   I prefer the brighter-line approach in which a matter constitutionally assigned to a political branch is beyond the judiciary's purview.   But as my colleagues reach the correct result through different means, with great respect I join that result.

---

[2]   Indeed, Mesnard's news release more resembles the "debate" that is textually contemplated by the Speech and Debate Clause than does the Sherman & Howard report, which is plainly neither legislative speech nor debate.   Moreover, our state constitutional provision is even more precise, and arguably narrower, than its federal counterpart, in that it immunizes only "words spoken in debate."   Ariz. Const. art. 4, pt. 2, § 7.   But I recognize that case law, as it is prone to do, has rendered opaque the text's plain meaning.